## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KHIN MAUNG THAN,                     )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        Civil Action No.
                                     )        1:05-CV-01042 (RMU)
RADIO FREE ASIA,                     )
                                     )
            Defendant.               )
                                     )

## DEFENDANT RADIO FREE ASIA'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), Defendant Radio

Free Asia, by counsel, hereby respectfully moves the Court to grant summary

judgment as to all Counts of Plaintiff Khin Maung Than's Corrected Amended

Complaint and Jury Demand. The grounds for this Motion are set forth in the

accompanying Memorandum and exhibits thereto, and the Statement of Material

Facts to Which There is No Genuine Dispute, which are incorporated herein by

reference.

Dated: December 22, 2006               Respectfully submitted,

                                       _Gil A. Abramson_

                                       Gil A. Abramson (Bar # 237994)

HOGAN & HARTSON LLP
111 South Calvert Street
Suite 1600
Baltimore, MD 21202
(410) 659-2700

Gregory M. Petouvis (Bar # 477600)
HOGAN & HARTSON LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600

Counsel for Defendant
Radio Free Asia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KHIN MAUNG THAN,<br><br>   Plaintiff,<br><br>  v.<br><br>RADIO FREE ASIA,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

       Civil Action No.
       1:05-CV-01042 (RMU)

## MEMORANDUM IN SUPPORT OF
## DEFENDANT RADIO FREE ASIA'S
## MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

   Plaintiff Khin Maung Than ("Plaintiff") filed suit against Defendant Radio Free Asia ("RFA") following RFA's separate decisions (1) to hire someone else as a full-time broadcaster in its Burmese Language Service in November 2003 and (2) not to renew one of his two consulting contracts in August 2004.  In his Corrected Amended Complaint and Jury Demand ("Complaint"), Plaintiff alleges that RFA discriminated against him on the basis of his gender because it hired a female broadcaster in November 2003 and retaliated against him in 2004 by not renewing one of his two consulting contracts, allegedly reducing his hours and cancelling his access card in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII") and § 2-1402.11 of the District of Columbia

Human Rights Act ("DCHRA"). The Complaint also purports to set forth a claim against RFA for intentional infliction of emotional distress.

      As explained more fully below, Plaintiff cannot make out a valid claim for gender discrimination. The record establishes that RFA offered the November 2003 full-time broadcaster position to a male who, unexpectedly, turned down the offer because of personal visa issues.[1] RFA then offered the position to the only other viable candidate, who was a woman, over Plaintiff and the remaining candidate, also male. The record is undisputed that both Plaintiff and the remaining male candidate had disqualified themselves from consideration because of their identical incorrect responses during their interviews to a screening question designed to expose political bias in their broadcasting.

      Likewise, Plaintiff's retaliation claim that one of his two his consulting contracts was not renewed because he filed a charge with the EEOC also should fail because Plaintiff cannot show that the decision makers had any knowledge of the charge prior to making the decision not to renew that contract. To the contrary, the uncontroverted testimony establishes that the decision makers in the Burmese Service had no knowledge of Plaintiff's charge or any other complaints at that time. In any event, Plaintiff cannot prove that RFA's legitimate, non-discriminatory reasons for not renewing the contracts, namely to periodically replace its voicing

---

[1] RFA offered a full-time broadcaster position to Tin Aung Cho who lived in Australia. Cho was unable to obtain an appropriate visa to come to the United States.

consultants who did not demonstrate the potential to become full-time broadcasters with new and fresh voices, was pretextual.

Plaintiff's remaining retaliation claims also fail because he cannot provide any evidence that RFA's explanations are pretextual. The record establishes that Plaintiff had no need for his access card after September 30, 2004 and that he was treated in the exact same manner as all other editorial consultants. Further, the record establishes without contradiction that any fluctuation in Plaintiff's hours as an on-call voice contractor in September 2004 was a function of his accessibility and responsiveness to calls asking him to work.

Plaintiff's claim for intentional infliction of emotional distress fails because he cannot make out a prima facie case for that cause of action under District of Columbia law.

Finally, Plaintiff is ineligible to recover any damages for back pay for his Title VII or DCHRA claims because he failed to satisfy his obligation to mitigate his damages and failed to conduct any meaningful search for interim employment. The record establishes that Plaintiff quit the only job he obtained during the relevant back pay period after five days.

For these reasons, as more fully discussed below, RFA is entitled to summary judgment on each of Plaintiff's claims.

## II. <u>FACTUAL BACKGROUND</u>

**A.    Radio Free Asia**

RFA is a private, non-profit corporation headquartered in the District of Columbia (<u>see</u> excerpt from RFA's Employee Handbook, attached hereto as Exhibit 1).  RFA broadcasters prepare and broadcast unbiased "local" information, news, and commentary about events in Asian countries that do not have a free press, including Burma, Cambodia, Laos, North Korea, China, Tibet, and Vietnam. <u>Id.</u>  RFA's nine language services broadcast in their respective native languages from RFA's studios in the District of Columbia.

The Burmese Language Service, in which Plaintiff currently works as an Editorial Consultant, broadcasts news and information to listeners in Burma. Its Director, Soe Thinn, and Deputy Director, Nyein "Nancy" Shwe, and Senior Editors currently supervise thirteen full-time broadcasters (<u>See</u> October 3, 2006 deposition of Soe Thinn ("Thinn Dep."), attached hereto as Exhibit 2, at 11), ten males and three females.[2]  In addition, the Burmese Service utilizes two kinds of outside contractors, Editorial Consultants and Voice Contractors, on an annual basis that corresponds with RFA's October 1 fiscal year.  Editorial Consultants write feature programs which, after editing by Senior Editors, they record over the telephone for broadcast as part of the Burmese Service programming.  (Thinn Dep. at 74-75, 111; November  9, 2006 deposition of Nyein Shwe ("Shwe Dep."), attached

---

[2]  (<u>See</u> RFA's Objections and Responses to Plaintiff's First Set of Interrogatories ("RFA's Ans. to Ints."), attached hereto as Exhibit 3, Response No. 4).  Two of the three female broadcasters were hired prior to 2003.  <u>Id.</u>

- 4 -

hereto as Exhibit 4, at 25-26, 58; November 10, 2006 deposition of Khin Maung

Nyane ("Nyane Dep."), attached hereto as Exhibit 5, at 32). The Burmese Service

uses Editorial Consultants to provide some relief for its full-time broadcasters who

work in a high pressure environment that requires a large volume of programming

with limited resources. (See October 31, 2006 deposition of Susan Lavery Rogers

("Lavery Dep."), attached hereto as Exhibit 6, at 21-22).[3] At the present time, the

Burmese Service employs twelve Editorial Consultants. (See RFA's Ans. to Ints.,

Response No. 4). Editorial Consultants are paid by the piece and do not work at

RFA's studios and, therefore, do not require access cards to enter RFA's studios.

(See Thinn Dep. at 82-83; see also October 1, 2002 Editorial Consultant Agreement,

attached hereto as Exhibit 8).

      Voice Contractors, on the other hand, come to RFA's workplace when

called to adapt print news stories to a radio broadcast format and, after review by

RFA language service editors, record, or "voice", these items for broadcast. (See

Nyane Dep. at 14-15, 56-57; Thinn Dep. at 36). Voice Contractors are hourly paid

on an on-call basis. (See Affidavit of Tamara Bagley ("Bagley Aff."), attached hereto

as Exhibit 9, ¶11).

      In August 2004 RFA's Finance Department sent a list of current

Editorial Consultants and Voice Contractors to each Language Service Department,

---

[3] Full-time broadcasters must produce two features per week in addition to their daily news duties. (Nyane Dep. at 46). Plaintiff has no comparable experience. He admittedly had no formal journalistic training. He once wrote a love story and translated some articles for a medical magazine. (See August 24, 2006 deposition of Khin Maung Than ("Than Dep. II"), attached hereto as Exhibit 7, at 261-62).

including the Burmese Service, so that Service Directors could determine whether they wanted to renew them for an additional year.  (See Shwe Dep. at 23; Lavery Dep. at 49).  The testimony is undisputed that Burmese Service Voice Contractors remain under contract only for a maximum of two or three years and are replaced so that fresh voices can be hired.  (See Thinn Dep. at 96, 99-101; Nyane Dep. at 23-24).

B.    **Plaintiff's employment at RFA.**

Beginning in 1998, Plaintiff submitted several applications for employment as a full-time broadcaster at RFA.  These applications were largely unsuccessful.  Between 1998 and 2001, Plaintiff wrote letters to the Human Resources Department and then-RFA President, Richard Richter, in which he complained that he had not been interviewed for broadcaster positions in the Burmese Service.  (See Plaintiff's January 18, 1999 and February 3, 2000 Letters to Tamara Bagley, attached hereto as Exhibits 10 and 11, respectively; January 28, 2001 E-mail from Plaintiff to Richard Richter, attached here to as Exhibit 12).  There is no evidence that anyone in the Burmese Service, including its Director, Soe Thinn, had any knowledge of these letters or their contents.  (Thinn Dep. at 168-71).[1]

In 2001, in response to an advertisement, Plaintiff submitted an application for an open full-time broadcaster position in the Burmese Service.

---

[1]  Soe Thinn testified at his deposition that the first time he saw or heard about any of these letters was at Plaintiff's deposition.  (Thinn Dep. at 168-171).  Likewise, neither Nancy Shwe, Deputy Director of the Burmese Service, and Susan Lavery, Assistant Director of Southeast Asian Services, had any knowledge any of these letters.  (Shwe Dep. at 94; Lavery Dep. at 45-46).

(August 23, 2006 deposition of Khin Maung Than ("Than Dep. I"), attached hereto as Exhibit 13, at 101). He took a language proficiency test for the second time. (Id. at 104). Plaintiff had taken the test in 1998 in connection with an earlier application. Normally, an applicant takes the test only once. In 2001, Tamara Bagley, RFA's Human Resources Specialist, scheduled Plaintiff for the test because she did not realize that he was the same person who had taken the test previously. (Bagley Aff. ¶ 10). Plaintiff apparently wrote his name differently on his cover letter from the way he wrote it on his previous application and Bagley did not realize that he had taken the second test until after it had been administered. (Compare October 28, 2001 letter to Soe Thinn and March 9, 2001 letter to Tamara Bagley, attached hereto as Exhibits 14 and 15, respectively; Bagley Aff. ¶ 10).[5] In any event, Plaintiff was not selected to be interviewed and the Burmese Service broadcaster position went to Win Naing Oo, a male. (Than Dep. I at 106).

In April 2002, Plaintiff was interviewed for a full-time broadcaster position in the Burmese Service. The interview was conducted by RFA Vice President of Programming and Executive Editor Dan Southerland and Deputy Director of Programming Alex Tseu (Than Dep. I at 114-15; Thinn Dep. at 98, 159-60) who at that time conducted all such interviews and made the hiring decisions. (Affidavit of Dan Southerland ("Southerland Aff."), attached hereto as Exhibit 18,

---

[5]  Plaintiff's scores on his 2001 test were lower than his scores on the 1998 test. (See Exhibits 16 and 17, respectively). Thus, contrary to Plaintiff's speculative belief, he did not improve on the second test, and his quest for a third test based on his belief that his scores would continue to improve was speculative and inaccurate. (See id.).

¶ 2). They did not select Plaintiff for the position. The person selected by Messrs. Southerland and Tseu, Dr. Ko Ko Aung, a male who was a medical doctor in Burma,[6] was not the choice of Soe Thinn. (Thinn Dep. at 122, 176-77).[7] Plaintiff admits that he does not know the reason he was not selected. (Than Dep. I at 188). According to Dan Southerland, Plaintiff was not selected primarily because he was weak and unimpressive during his interview. (Southerland Aff. at ¶ 3).

It should be noted that Soe Thinn, the Director of the Burmese Service, intervened on behalf of Plaintiff to get him placed on the list of interviewees in 2002. (Thinn Dep. at 121). Although Plaintiff's language test scores were relatively low, Soe Thinn asked that Plaintiff be interviewed as a courtesy because "he [Plaintiff] was a friend of a friend," and Soe Thinn wanted to give him a chance. (Thinn Dep. at 121-22; see Southerland Aff. at ¶ 3).

In April 2002, Plaintiff contacted Soe Thinn directly and applied for a position as a Voice Contractor. Soe Thinn and Nancy Shwe, the Burmese Service Deputy Director, hired Plaintiff.[8] On May 15, 2002, Plaintiff signed a Consultant Agreement as an on-call Voice Contractor. (See May 15, 2002 Consultant

---

[6]  Ko Ko Aung had no previous broadcast experience and began working on April 29, 2002. (See RFA's Ans. to Ints., Ex. 3, Response No. 4).

[7]  Soe Thinn's choice would have been to hire Tin Aung Cho. (Thinn Dep. at 176). In November 2003, when Soe Thinn had assumed responsibility for interviewing and hiring applicants, he and his Deputy Director offered a broadcaster position to Cho. (Id. at 127; Shwe Dep. at 67).

[8]  Contrary to Plaintiff's assertion, he was not administered any formal "test." He was given a print news item to rewrite and was put in a broadcast studio so that his "voice" could be heard. (See Thinn Dep. at 147-149; Shwe Dep. at 86-87.) This was completely different from the more formal four part language test that he took in connection with his application for a full-time broadcaster position. (See id.)

Agreement between Khin Maung Than and Radio Free Asia, attached hereto as Exhibit 19). This agreement expired on September 30, 2002, and was renewed effective October 1, 2002 and 2003, respectively. (See Thinn Dep. at 68).

Later, in June, 2002, Plaintiff began discussions with Soe Thinn to write a weekly feature. (Than Dep. II at 260). Soe Thinn suggested that Plaintiff, who is a medical doctor in Burma (Than Dep. I at 16), write features on the topic of Science and Technology. On October 1, 2002, Plaintiff was given an Editorial Consultant Agreement under which he would be paid the standard rate of $75.00 for each feature that he prepared and that was broadcast by the Burmese Service. (See October 1, 2002 Editorial Consultant Agreement (Ex. 8); Than Dep. I at 153-54; Bagley Aff. ¶ 11). This contract has been renewed annually, effective October 1, each year since, and Plaintiff currently is working under this contract. (Thinn Dep. at 85-86).

Plaintiff mistakenly believed that the Editorial Consultant position was an avenue to employment as a full-time broadcaster. (Than Dep. I at 124-25). Plaintiff admits, however, that this was entirely his own subjective belief and that no one made any representations to him to this effect. (Id.).

C.    **November 2003 hire of full-time broadcaster in the Burmese Service.**

In 2003, the process for employing broadcasters was administered by RFA's Human Resources Department. Human Resources would post a generic

advertisement[9] for a broadcaster position, receive and review any applications to
determine which applicants would be invited to sit for a language proficiency test,
select a small number of applications for forwarding to the appropriate language
service director and, after hearing from the language service director, schedule
interviews. (Thinn Dep. at 54, 120; Bagley Aff. ¶¶ 5-7).

        The language proficiency test was used as a screening device to help
determine which applicants would be interviewed. (Thinn Dep. at 29). In 2002, the
test for Burmese Service candidates was administered by Human Resources and
graded by an outside person who was not an employee of RFA. The scores were
blinded so that the identity of the test taker could not be disclosed to anyone outside
of Human Resources. (Thinn Dep. at 49-50; Bagley Aff. ¶ 6). The four part test was
designed to measure the applicant's ability to translate and adapt news stories from
English to Burmese, fluency in both English and Burmese; and the quality of the
voices for broadcasting. (See Thinn Dep. at 29-31; Bagley Aff. ¶ 6). Human
Resources would select the four or five top scorers and forward their applications to
the service directors as a screening device to decide which applicants would be
selected for interviews. (Thinn Dep. at 54, 120; Bagley Aff. ¶ 7).

---

[9]   Plaintiff may argue that the job description is not generic but, rather, specific. While the
advertisement says that one year broadcast experience is required for the position, RFA has
recognized, indeed accepted, the fact that most applicants will not have any broadcast
experience. (Thinn Dep. at 131-132; Shwe Dep. at 78-80; Bagley Aff. ¶ 4). The reason for the
lack of broadcast experience among applicants stems from the nature of the societies in RFA's
target countries which do not have journalism schools or, more importantly, a free press. Both
Soe Thinn and Nancy Shwe began their broadcasting careers without any previous broadcast
experience. (Thinn Dep. at 131; Shwe Dep. at 79-80). This is true for others on the Burmese
Service as well, including Ko Ko Aung and Kyi Kyi Than. (See, e.g., Resumes of Ko Ko Aung
and Kyi Kyi Than, attached hereto as Exhibits 20 and 21, respectively).

Since 2003, all interviews for positions in the Burmese Service have been conducted by Soe Thinn and Nancy Shwe. (Thinn Dep. at 98, 159-60; Shwe Dep. at 8). In October 2003, Soe Thinn and Nancy Shwe, selected four individuals to be interviewed for the full-time broadcaster position: Tin Aung Cho (male), Maung Maung Nyo (male), Kyi Kyi Than (female), and Plaintiff (male).[10] As indicated above, Tin Aung Cho had been Soe Thinn's choice in 2002 when another candidate was selected by Dan Southerland and Alex Tseu. Although Plaintiff would not have been selected for an interview in 2003, Soe Thinn again intervened on his behalf to include him on the list of interviewees, despite the fact that Plaintiff was not a strong candidate. (Thinn Dep. at 122, 169). Soe Thinn included Plaintiff "to give him [yet] another chance to prove that he can become a full-time broadcaster" during the interview where he would be on an equal footing with the other candidates and because Plaintiff had been interviewed previously.[11] (Thinn Dep. at 122). Unfortunately for Plaintiff, he did not do well in the 2003 interview.

Each applicant was interviewed in-person by Soe Thinn and Nancy Shwe, except Tin Aung Cho who was interviewed via telephone because he lived in Australia. (Thinn Dep. at 124; see also Shwe Dep. at 83-84). Interview questions were geared to screen candidates' understanding of RFA and its role, the role of the

---

[10]  Plaintiff asked to take the language proficiency test for a third time. He was not allowed to take the test again because (1) Soe Thinn included him in the group of interviewees (Thinn Dep. at 121-22) and the test, which was used to determine eligibility for an interview, was unnecessary; and (2) because, in any event, RFA's practice was to permit an applicant to take the test only once (Bagley Aff. ¶ 5).

[11]  As stated supra, pp. 7-8, Dan Southerland and Alex Tseu interviewed Plaintiff in April 2002 and did not select him for a full-time broadcaster position.

media in general, journalistic ethics, and the independence and objectivity of the media. (Shwe Dep. at 72). Plaintiff recalls being asked questions regarding how the Burmese Service could be improved (Than Dep. I at 170) and responding with suggestions to include programming regarding social issues and audience participation. (Id. at 170-71).[12] Plaintiff testified that he does not remember anything else about his interview and does not remember any other questions that were asked to him. (Than Dep. I at 171).

According to the undisputed testimony of Soe Thinn and Nancy Shwe, they asked a specific question to each interviewee that was geared to screen whether the interviewee was likely to exhibit political bias in writing and reporting the news as a full-time broadcaster. (Thinn Dep. at 20). Political biases, if broadcast on RFA, are problematic because they run counter to accepted journalistic standards and RFA's mission to broadcast balanced and fair editorial content and news. (See Thinn Dep. at 78, 131). The avoidance of journalistic bias is intuitive and political biases are "devastating." (Thinn Dep. at 140-41). Accordingly, each applicant was asked a critical question whether he or she would broadcast a news story that portrayed Aung San Suu Kyi (a popular Burmese opposition figure) in a negative light if that story were true. (Thinn Dep. at 122-23; Shwe Dep. at 71). Soe Thinn explained:

> . . . [O]ne critical question to all our interviewees that the
> Burmese Service did was whether you would put a . . . news

---

[12]  Plaintiff's latter response showed a complete lack of understanding of the Burmese Service audience which has limited to no means or political ability to participate in RFA's broadcasts.

> item which is detrimental to Aung San Suu Kyi on the radio or
> not. And if an interviewee says no, then he is automatically . . .
> rejected, no matter what kind of journalism experience or
> whatever. We've done that in the past. And we're still doing it.
> And Maung Maung [Plaintiff] said no. So he was -- what's the
> word -- vetoed, blackballed, or rejected.

(Thinn Dep. at 122-23). Thus, the record is undisputed that applicants who

answered the question incorrectly, that is applicants who indicated that they would

not broadcast such a story, were automatically disqualified from further

consideration and would not be hired as full-time broadcasters in the Burmese

Service. (Shwe Dep. at 71-72; Thinn Dep. at 122-23; Lavery Dep. at 51-52).

   Of the four candidates interviewed for the 2003 full-time broadcaster

position, only two candidates, Tin Aung Cho and Kyi Kyi Than, answered the Aung

San Suu Kyi question correctly. The other two interviewees, Plaintiff and Maung

Maung Nyo, answered the question incorrectly, thus disqualifying themselves from

further consideration. (Thinn Dep. at 123, 127, 134-37; Shwe Dep. at 66-67, 69, 74).

Based upon the applicants' performance during their interviews, Soe Thinn and

Nancy Shwe selected Tin Aung Cho, a male, for the position. (Thinn Dep. at 127;

Shwe Dep. at 67). Cho, who had no previous journalistic experience (see Resume of

Tin Aung Cho, attached hereto as Exhibit 22), had been Soe Thinn's choice for the

2002 position, was a friend since they were five years old, and shared with Soe

- 13 -

Thinn prior work experience at the Burmese Foreign Service. (Thinn Dep. at 144, 176).[13]

As indicated above, Tin Aung Cho was unable to obtain a visa, and he withdrew as a candidate. (Thinn Dep. at 127; Shwe Dep. at 68). The only remaining viable candidate was Kyi Kyi Than who was offered and accepted the job. (Thinn Dep. at 127; Shwe Dep. at 76-77).

**D.    Plaintiff's work as a Voice Contractor.**

Plaintiff continued to work for the Burmese Service in accordance with his contracts as an Editorial Consultant and a Voice Contractor. As indicated previously, however, every two or three years, the Burmese Service hires new Voice Contractors to provide listeners with new and fresh "voices" in its broadcasts. (Nyane Dep. at 23-24; see Thinn Dep. at 99, 101-02). Accordingly, in August 2004,[14] Soe Thinn, and Nancy Shwe, made a decision not to renew the voicing contracts for all three of the Voice Contractors employed at that time by the Burmese Service. In addition to their desire to provide new voices for the Burmese Service's broadcasts, Soe Thinn and Nancy Shwe decided not to renew the three contracts because none of the contractors had shown the potential to become full-time broadcasters. (Thinn Dep. at 34, 96-97; Shwe Dep. at 47-48). These individuals had worked as Voice Contractors for a period of time ranging from two years to two years and four and

---

[13]  Nyo, who had the most journalistic experience of all four candidates, nevertheless was disqualified because of his incorrect response to the bias question. (Resume of Maung Maung Nyo, attached hereto as Exhibit 23).

[14]  All of the Burmese Service's other voice contractors between 2002 and the present have remained for three months to almost a year. (RFA's Ans. to Ints., Response No. 4)

- 14 -

half months.  (See RFA's Ans. to Ints., Request No. 4).[15]  Shortly thereafter, Soe

Thinn and Nancy Shwe hired two new Voice Contractors, Zaw Moe Kyaw (male)

and Nang San Nong (female).  (Shwe Dep. at 84-85; Thinn Dep. at 146-47).  Nong

remained only for three months.  (RFA's Ans. to Ints., Response No. 4).  Zaw Moe

Kyaw currently is employed as a full-time broadcaster in the Burmese Service.

      Plaintiff and Tin Maung Than continue to work as a Editorial

Consultants in the Burmese Service.[16]

## III.  ARGUMENT

### A.    Legal standard for a motion for summary judgment.

      Summary judgment is appropriate where the parties' pleadings,

depositions, interrogatory answers, admissions, and any affidavits show that there

is no genuine issue of material fact and the moving party is entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  The mere existence

of an alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment.  Only disputes of fact that might

affect the outcome of the lawsuit under governing law will preclude the entry of

---

[15]  Plaintiff worked from May 15, 2002, Khin Myo Thet had worked from May 14, 2002, one
day longer than Plaintiff, and Tin Maung Than worked from October 1, 2002.

[16]  Ironically, Susan Lavery testified that she had not been impressed with Plaintiff's work as an
Editorial Consultant, and did not want to renew his contract. (Lavery Dep. at 20-21).  Soe Thinn, on
the other hand, wanted to renew the contract and Lavery accepted his decision. (Id.).

summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Gardner v. District of Columbia, 448 F.Supp.2d 70, 73 (D.D.C. 2006).

Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in pleadings, but must set forth specific facts demonstrating the existence of a genuine issue of material fact requiring a trial. See id. at 248-49; Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1041 (D.C. Cir. 2003). Evidence that is "merely colorable" or "not significantly probative" will not prevent summary judgment. Gardner, 448 F.Supp.2d at 73, quoting Anderson, 477 U.S. at 249-50. Although the Court must draw all justifiable inferences in the light most favorable to the non-moving party, see id., "neither the nonmovant's conjecture and surmise nor mere conclusory allegations of discrimination, without more are sufficient to defeat a motion for summary judgment." See Morgan v. Fed. Home Loan Mort. Corp., 172 F.Supp.2d 98, 110 (D.D.C. 2001) aff'd, 328 F.3d 647 (D.C. Cir. 2003) (internal citation and quotation omitted).

**B.    Plaintiff cannot make out a prima facie case of gender discrimination with regard to the November 2003 hiring of a full-time broadcaster.**

**1.    Tin Aung Cho, a male, was offered the full-time broadcaster position in the Burmese Service in November 2003.**

The record is undisputed that, after interviewing four candidates, Soe Thinn and Nancy Shwe offered the full-time broadcaster position to a male, Tin Aung Cho. In his deposition, Plaintiff readily admitted that it would not have been

- 16 -

gender discrimination for another male candidate to be selected over him irrespective of his qualifications. (Than Dep. I at 192-93). As courts in this Circuit have noted, "[i]n cases where the disputed position is filled with a member of the same protected class as the plaintiff, the argument for an inference of discrimination will be severely undermined." See Pyne v. Dist. of Columbia, No. Civ. 01-275, 2006 WL 695807 at *4 (D.D.C. 2006); see also Murray v. Gilmore, 406 F.3d 708, 715 (D.C.Cir. 2005) ("a replacement within the same protected class cuts strongly against any inference of discrimination"). Although the candidate who ultimately was hired by RFA is a woman, Plaintiff does not dispute that RFA's first choice for this position was a male.

In any event, Soe Thinn articulated legitimate, non-discriminatory reasons for the selection of Cho for the full-time broadcaster position. Cho had been Soe Thinn's choice for hiring in 2002, when Soe Thinn had no authority to make the selection. Cho, a long time acquaintance, had been friends with Soe Thinn since they were five years old, and they both had worked in the Burmese Foreign Ministry. Cho held a degree in history and had experience in international relations, which is "the sort of general knowledge a journalist must have." (Thinn Dep. at 132). More importantly, Cho, whose job offer Plaintiff does not assert was discriminatory,[17] did not have any prior broadcasting or specialized journalism experience. (Thinn Dep. at 130).

---

[17]  Plaintiff, nevertheless exhibiting a discriminatory regard for Cho, characterized Cho as "a foreigner." (See February 23, 2004 letter from Khin Maung Than to the Chairman of the

2.    **Plaintiff cannot prove that the reasons for offering the full-time broadcaster position to Kyi Kyi Than were discriminatory or pretextual.**

Plaintiff rests his gender discrimination claim solely on a single fact: that Kyi Kyi Than is a woman.  Plaintiff admitted during his deposition that he has no knowledge of why Ms. Than was hired other than her gender (Than Dep. I at 178-80) and asserts that she was hired "strictly because she was a woman" (<u>Id.</u> at 178).

It goes without saying that Ms. Than was and still is a woman.  But that is not the reason she was offered the broadcaster position.  The record is uncontradicted that Ms. Than received an offer for employment only after the initial offer to Tin Aung Cho was mooted out by his withdrawal from consideration due to visa problems.  When that occurred, Ms. Than was the only viable candidate because she was the only other interviewee who responded appropriately to the bias question during her interview.[18]

Plaintiff and the other interviewee, on the other hand and irrespective of gender, responded incorrectly to the bias screening question regarding the Burmese opposition leader Aung San Suu Kyi and, thus, became ineligible for any further consideration.

---

Broadcasting Board of Governors, attached hereto as Exhibit 24).  Plaintiff also accused Soe Thinn of "cronyism" in hiring his friends.

[18]  Plaintiff may argue that RFA should have re-advertised the position after Cho withdrew.  According to Soe Thinn's uncontested testimony, there was no need to re-advertise the position because there still was another viable candidate who emerged from the interviews.

- 18 -

Plaintiff may contend that the Aung San Suu Kyi question should have been listed as a formal job qualification and, because it was not, should not be regarded as a legitimate screening device. Soe Thinn, in his deposition, addressed this point:

> [Y]ou know, you're hiring a journalist. People should know. People applying for the job should know what journalistic ethics are, for that matter. And it's –it's a generally accepted fact.

(Thinn Dep. at 133).

The Burmese Service's choice to use the Aung San Suu Kyi question as a screening mechanism for applicants is a business judgment that should not be disturbed where, as here, there was no discriminatory motive. See Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 ("the court must respect the employer's unfettered discretion to choose among qualified candidates."); Moore v. West, 991 F.Supp. 11, 15 n.7 (D.D.C. 1998) aff'd, No. 98-5030, 1998 WL 796216 (D.C. Cir. Oct. 28, 1998) (finding that employer produced convincing evidence of a non-discriminatory reason for its non-selection of the plaintiff although the non-selection was based upon a requirement that was not listed in the employer's official job description). The same question was asked of all four interviewees and has been used by Soe Thinn and Nancy Shwe in all interviews beginning in 2003 when they assumed responsibility for conducting job interviews for the Burmese Service. (Thinn Dep. at 122-23; Shwe Dep. at 8). In any event, no one would dispute that adherence to strict ethical principles is a legitimate screening device in the broadcast journalism business, especially in a setting as RFA's where ethics and

honesty in reporting is the essence of RFA's credibility.  (See RFA Employee

Handbook (Ex. 1); Thinn Dep. at 131; Lavery Dep. at 52).

      Further undermining Plaintiff's claim is that he cannot prove that the

reasons for selecting Ms. Than were discriminatory.  While Plaintiff asserts that Ms.

Than was not qualified for the full-time broadcaster position, the record establishes

otherwise.  Soe Thinn and Nancy Shwe articulated legitimate, non-discriminatory

reasons for choosing Kyi Kyi Than, including her experience as a vocalist in a public

forum, a comfort level before the microphone, a background in economics from Soe

Thinn's alma mater in Burma and, most importantly, she answered the Aung San

Suu Kyi question correctly.  (See Thinn Dep. at 128; Shwe Dep. at 69-70, 78).

      Plaintiff's assertion that Ms. Than was not qualified for the

broadcaster position because she lacked prior broadcast or journalism experience is

inapposite.  Cho, to whom the position was offered initially, also had no prior

broadcast or journalism experience.  Neither Soe Thinn nor Nancy Shwe had any

journalism experience before they were hired as broadcast journalists.  (Thinn Dep.

at 131; Shwe Dep. at 79-80).  The record establishes that while such experience is

"one of the pluses, . . . we don't actually . . . take journalistic broadcasting

experience as a must."  (Shwe Dep. at 78-79).  Shwe explained:

> [W]e have a very limited field to select from, because in Burma
> we don't have a –what do you call it?—broadcasting school or
> whatever, journalism school . . . .

(Shwe Dep. at 79).  Soe Thinn explained further that under the Socialist regime in

Burma, there were no, or very few, journalists, so "not a lot of people have

- 20 -

experience in journalism." (Thinn Dep. at 131). Thus, it has not been practical or possible for the Burmese Service to insist on such experience. The record further establishes that the Burmese Service does not control the content of job advertisements which are administered solely by RFA's Human Resources Department which uses a generic advertisement for all nine of its language services. (See Bagley Aff. ¶ 4).

In any event, Plaintiff was judged unqualified for the full-time broadcaster position because of his incorrect answer to the Aung San Suu Kyi bias question, which is completely unrelated to his gender and which is undisputed on this record. In such circumstances, his prior experience, even assuming that his average work[19] as an Editorial Consultant would be regarded as such, was irrelevant. As Soe Thinn explained:

> Even if they had journalism experience, if they do not—if they cannot prove that they do not have political biases, then we reject them outright. Because RFA's policy is very strict about political biases . . . . We are not an organization which has any political biases.

(Thinn Dep. at 131-32). Under well-settled principles, a difference in opinion over Plaintiff's and Kyi Kyi Than's relative qualifications for the position is not evidence of pretext. See Fischbach, 86 F.3d at 1183 ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.").

---

[19]   Plaintiff's work product as an Editorial Consultant was described as "normal," "adequate" and "average." (Thinn Dep. at 60-61; see also Shwe Dep. at 14-15; Nyane Dep. at 16; Lavery Dep. at 15-17).

Here, the sole decision makers, Soe Thinn and Nancy Shwe, provided legitimate, non-discriminatory reasons for selecting Kyi Kyi Than and "[e]ven if a court suspects that a job applicant was 'victimized by [ ] poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive." See Fischbach, 86 F.3d at 1183, quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982). In sum, Plaintiff cannot prove, as he must, "both that the reason [given by RFA] was false, and that discrimination was the real reason" for his non-selection and the job offer to Ms. Than. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Ironically, Plaintiff ascribes discriminatory intent to Soe Thinn. What Plaintiff fails to appreciate is that Soe Thinn actually helped him on several accounts. Soe Thinn intervened on Plaintiff's behalf to get him included for an interview twice, in 2002 and in 2003. Soe Thinn testified that he wanted to give Plaintiff a chance to prove himself. Soe Thinn also hired him for two different positions within a year of the alleged discrimination in two different positions in the Burmese Service. See King v. Georgetown Univ. Hosp., 9 F.Supp.2d 4, 7 (D.D.C. 1998) (plaintiff's claim that she was treated in a discriminatory manner by a supervisor was undermined by the fact that she was originally hired by the same supervisor); see also Birbeck v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir. 1994) (holding that "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of a pretextual firing."); Rand v. CF Indus., 42 F.3d 1139, 1147 (7th Cir. 1994) (holding that where same decision-

maker hired and fired plaintiff within span of two years, a jury could not draw an inference that he engaged in age discrimination absent specific evidence of animus).

Plaintiff also fails to appreciate what should have been obvious to him from working in the Burmese Service: there are an overwhelming number of male broadcasters in the Burmese Service which reflects a hiring practice that arguably favors males. The record establishes that, since 2002, there have been three times more males than females (12 to 4) employed in the Burmese Service as full-time broadcasters. (RFA's Ans. to Ints. (Ex. 3), Response No. 4). During the same period of time, the Burmese Service hired a total of nine full-time broadcasters of which only two were women, Kyi Kyi Than and San San Tin (who was hired in 2005). (Id. at Response No. 13).

Plaintiff's remaining arguments are equally without merit. Plaintiff asserts that Kyi Kyi Than's short tenure with the Burmese Service should be used to describe a discriminatory motive to her hire. To the contrary, the record is undisputed that Ms. Than voluntarily resigned from the Burmese Service not because her work was inferior but, rather, because she did not want to handle the daily pressure of the position. (Nyane Dep. at 45-46). Further, Ms. Than's performance after she was hired is not probative of a discriminatory motive at the time she was selected. See Snik v. Verizon Wireless, No.Civ.A. 03-CV-2976, 2004 WL 1151711, *10 n.5 (E.D.Pa. May 21, 2004) (evidence of the selected candidate's post-hire performance is not relevant and does not constitute evidence that plaintiff was discriminated against at the time of the hiring decision). It is well-settled that

"Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions," Jackson v. Gonzales, No. Civ.A. 03-1596, 2005 WL 3371041, *9 (D.D.C. Dec. 12, 2005), quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C.Cir. 1999) and that "absent a demonstrably discriminatory motive, an employer's personnel decision . . . simply cannot be second-guessed." Tolson v. James, 315 F.Supp.2d 110, 117 (D.D.C. 2004) (internal citations and quotation marks omitted); see also Fischbach, 86 F.3d at 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.") (internal citations and quotation marks omitted).

Likewise, Plaintiff asserted in his deposition that Ms. Than received "special favors" in the form of a promise of a higher pay grade if she were employed. (Than Dep. I at 183). Plaintiff has no proof of this assertion and admitted that he did not know why she was placed in any particular pay grade. (Id. at 184). Plaintiff's propensity to go into other employees' cubicles and look around (Shwe Dep. at 17) is the likely source of pay information which, in any event, is not probative of any discriminatory intent by the employer. Moreover, it doesn't make any sense. During the interviews it could not have been known that Ms. Than would receive any offer and it could not have been predicted that Cho, who received an offer, would have to decline.

In these circumstances, summary judgment is warranted for RFA on Plaintiff's claim of gender discrimination.

3.    **Plaintiff cannot prove that RFA's legitimate non-discriminatory reasons not to renew three voicing contracts in August 2004 were retaliatory or pretextual.**

Plaintiff's retaliation claim, like his gender discrimination claim, is founded entirely upon conjecture and speculation.  Plaintiff does not claim that he engaged in any protected activity other than the filing of his EEOC charge in August 2004.  Plaintiff alleges three specific acts of alleged retaliation:  not renewing his voicing contract, cancelling his access to RFA's office building, and reducing his September 2004 hours.  Plaintiff's claim fails because (1) he cannot rebut that each of these actions was taken for legitimate non-discriminatory reasons, as explained below, and (2) he cannot establish a causal link between these actions and his filing an EEOC charge.[20]

The uncontradicted record establishes that RFA did not renew Plaintiff's voice contract, and the contracts of the other two Burmese Service voice contractors as well, because (1) consistent with their stated practice, Soe Thinn and Nancy Shwe wanted new "voices" for their broadcasts and (2) none of the three voice contractors demonstrated the potential to become full-time broadcasters.  (See Thinn Dep. at 96, 101; Shwe Dep. at 47-48; see also Nyane Dep. at 22-24).  There is no contrary evidence to the testimony of Soe Thinn, Nancy Shwe, and Senior Editor

---

[20]    Like other claims under Title VII, a claim of retaliation invokes application of the McDonnell Douglas framework, except that to establish a prima facie case of retaliation, a plaintiff must show: "1) that he engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two."  Morgan, 328 F.3d at 651.

Khin Maung Nyane that the Burmese Service regularly changed the Voice
Contractors every two or three years in order to provide their listeners with new
"voices." See id. The tenure of the three voice contractors comports with this time
frame. Thus, Plaintiff's voice contract commenced on May 15, 2002, Khin Myo
Thet's on May 14, 2002 (one day longer than Plaintiff's) and Tin Maung Than's from
October 1, 2002.[21]

The record also is uncontested that access to the office building was
necessary for Voice Contractors so they could enter the building to write their news
pieces and record them.  (Nyane Dep. at 29).  When they no longer were Voice
Contractors, their access to the building was cancelled.  (Id. at 29).  Thus, all three
Voice Contractors' access to the building was cancelled when their voice contracts
expired.  This was totally unrelated to Plaintiff's EEOC charge.  Plaintiff was
treated exactly the same as all Voice Contractors when his contract expired.  It
follows that, once his voice contract expired, Plaintiff was not permitted to record
the features that he wrote as an Editorial Consultant in the RFA studios.  The
record is uncontested that Plaintiff was the *only* Editorial Consultant who recorded
his features in the studios because he was otherwise in the studio as a Voice
Contractor.  (See Thinn Dep. at 82-83, 110-11; Shwe Dep. at 56-58).  Tin Maung
Than, who also was an Editorial Consultant, recorded his features from home as did

---

[21]  Plaintiff's assertion that something adverse should be read into the renewal of each of these
contracts on October 1, 2003 is misplaced.  At that time, each had worked as a voice contractor
only for a year or so and it was too early to find new "voices."  By the same token, waiting
another year until 2005 would have exceeded the range for "voices" in the Burmese Service.
(See Thinn Dep. at 106).

all other Editorial Consultants at RFA. (See id.). Once he no longer had a voice contract, Plaintiff, like every other Editorial Consultant at RFA, was required to record his features over the telephone and was not given access to RFA's office building.[22] (Thinn Dep. at 109-12; Shwe Dep. at 56-58; see Nyane Dep. at 29-30) Plaintiff cannot ascribe a discriminatory motive to the requirement that he record his features over the telephone; he testified that "had no idea" what the reason was. (Than Dep. I at 155).

　　　　Contrary to Plaintiff's assertion, RFA did not cut his hours in September 2004. (Thinn Dep. at 114). Any change in Plaintiff's hours in September is attributable only to Plaintiff's unavailability and inaccessibility when RFA attempted to contact Plaintiff. (Thinn Dep. at 116-17). The testimony is clear that Plaintiff was very difficult to contact when RFA needed to communicate with him regarding its scheduling needs. The caller would have to leave a voice message in his cell phone, the only number he provided to RFA, and wait for Plaintiff to return the call. (See Thinn Dep. at 62-63; Shwe Dep. at 28-31). Sometimes, RFA's need for a Voice Contractor was immediate and another contractor was called. As Soe Thinn testified:

　　　　　　　　[By D. Kouba]
　　　　　　　　Q:　　Okay. But if a voice consultant's hours were reduced
　　　　　　　　　　　because there was not a need for them, would one expect
　　　　　　　　　　　all voice consultants' hours to be reduced similarly?

---

[22] Plaintiff's assertion that the quality of the recording over the telephone from home was not as good as recording from RFA's studios is beside the point. The record is uncontested that the telephone recordings meet RFA's requirements because it broadcasts in short wave which, in any event, is not the clearest sound. (Thinn Dep. at 111-113; Shwe Dep. at 58-59; Nyane Dep. at 30).

> A:      . . . first of all, there has to be a need.  Secondly, there has
> to be accessibility.  We call up three – there are three
> voice consultants: A, B, and C.  We call up A – A, B, or C's
> not free, we call up D or whatever, B, C.  And it goes
> on . . . .  Our need is short notice, because it's an
> emergency.

(Thinn Dep. at 116).  Plaintiff's lack of immediate availability was not unique to

RFA.  His live-in girlfriend, Yamin Nyein, also had to leave messages on his cell

phone and await a return call.  (October 26, 2006 deposition of Yamin Nyein ("Nyein

Dep."), attached hereto as Exhibit 25, at 62-63).

The administrative assistant in the Burmese Service was responsible

to contact Voice Contractors, all of whom worked on an on-call basis.  (See Affidavit

of Ariah Francois, attached hereto as Exhibit 26, ¶ 2).  She was tasked with

ensuring that hours were evenly distributed among the Voice Contractors.  However,

if she were unable to reach one, she would call another.  Id. at 3.  This was not a

function of a retaliatory motive on the part of either Soe Thinn or Nancy Shwe, both

of whom testified that they were unaware of Plaintiff's hours.  (Thinn Dep. at 113-

17; Shwe Dep. at 59).

In any event, the hours of the three Burmese Service Voice Contractors

always fluctuated.  For example, Khin Myo Thet's hours ranged from a low of 20

hours (in April 2004) to a high of 60 hours (in December 2003); Tin Maung Than's

hours ranged from a low of 16 hours (in October 2003) to a high of 48 hours (in

August 2003); and Plaintiff's hours ranged from a low of 16 hours (in September

2004) to a high of 66 hours (in December 2003).  (See Relevant Portions of

Timesheets of Khin Myo Thet, Tin Maung Than, and Plaintiff, attached hereto as Exhibit 27).

In light of the record of uncontested testimony, Plaintiff cannot produce any direct evidence that RFA retaliated against him. Rather, his claim rests solely on the temporal proximity of his protected activity and the allegedly adverse employment actions. However, the record is undisputed that the decision makers in the Burmese Service in particular, Soe Thinn and Nancy Shwe (Shwe Dep. at 90-91; Lavery Dep. at 41; see Thinn Dep. at 150-51, 153-54), and RFA in general, were not aware that Plaintiff had filed an EEOC charge at the time the decision was made not to renew the voicing contracts. Nancy Shwe testified:

> [By Mr. Kouba]
> Q:    We were discussing when you first became aware of the EEOC complaint Maung Maung [Plaintiff] filed in 2004.
>
> A:    As I said before not too long ago. I put that behind me.
>
> Q:    I believe you said you first became aware of this when a lawyer called you up?
>
> A:    Yes.
>
> Q:    When was the first time any lawyer discussed the EEOC complaint with you?
>
> A:    In November of last year [2005].
>
> Q:    Prior to November, you had no knowledge of the EEOC complaint?
>
> A:    No.

(Shwe Dep. at 90-91). Thus, neither Soe Thinn nor Nancy Shwe had any knowledge of the EEOC charge until long after they made the decision not to renew Plaintiff's

- 29 -

voice contract. Shwe testified that she had no knowledge of the charge or of <u>any</u> complaints that Plaintiff may have had against RFA in 2004. (<u>Id.</u> at 94).

   While Soe Thinn testified that he learned of the EEOC charge in the "fall of 2004," there is no evidence that the charge was taken into consideration when reaching a decision regarding the Voice Contractors. (<u>See</u> Thinn. Dep. at 166). The evidence is to the contrary. First, Nancy Shwe and Susan Lavery both testified that the decision had been completed in August. (Shwe Dep. at 101-02; Lavery Dep. at 17-18). Second, the decision concerning the voice contractors would have been made at that time irrespective of the filing of any charges. It is undisputed that such decisions historically were made at that time and thus no discriminatory motive can be ascribed to the timing if the decision. <u>See</u> <u>Carpenter v. Fed. Nat'l Mort. Ass'n.</u>, 174 F.3d 231, 236, n.3 (D.C., Cir. 1999) (Title VII retaliation claims fail where the employer demonstrates by a preponderance of the evidence that "it would still have taken the same action absent retaliatory motive."). Third, Soe Thinn rejected Susan Lavery's suggestion that Plaintiff's Editorial Consultant agreement be cancelled (Lavery Dep. at 26-27), which is entirely inconsistent with any intent to retaliate against Plaintiff. If Soe Thinn wanted to take adverse action against Plaintiff, he had a ready excuse to do so based on Lavery's suggestion, but he did not. Fourth, Soe Thinn articulated sound, reasonable and non-discriminatory reasons, <u>infra</u>, for the decision, which Plaintiff cannot prove were pretextual.[23]

---

[23] The record further shows that Plaintiff's charge could not have reached the decision makers at the time their decision was made. The charge, whenever it arrived at RFA, was mailed to the

In these circumstances, no inference of knowledge of the charge prior to the making of the decision at issue can be made. All witnesses denied any knowledge of the charge at the operative time. Plaintiff ultimately bears the burden of establishing that but for the fact that he filed a charge, he would not have suffered adverse employment actions. See Williams v. Boorstin, 663 F.2d 109, 117 (D.C.Cir. 1980) ("a Title VII violation is made out only if the employee would have retained his job but for any retaliatory motive"); Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1423 (D.C. Cir. 1988) ("this Circuit has adopted a 'but for' test of causation" in retaliation cases). Based on the facts established in discovery in this case, Plaintiff cannot do so. Accordingly, summary judgment on his retaliation claim should be granted.

**C.    Plaintiff has not alleged, and the evidence in the case shows that he cannot allege, the essential elements of a prima facie case of intentional infliction of emotional distress.**

Under District of Columbia law, a claim for intentional infliction of emotional distress, in the absence of physical injury, requires a plaintiff to demonstrate (1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress. See Smith v. District of Columbia, 882 A.2d 778, 794 (D.C. 2005); see also Sturdza v. United Arab Emirates, 281 F.3d 1287, 1305 (D.C. Cir. 2002).

---

then-Human Resources Director, and was sent to outside counsel who handled EEOC charges for RFA. (Bagley Aff. at ¶ 12).

With respect to the first element, whether conduct is "'extreme and outrageous" is for the court to determine as an initial matter. See Sere v. Group Hospitalization, Inc., 443 A.2d 33, 38 (D.C. 1982), cert. denied, 459 U.S. 912 (1982). Liability will only be found where the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Richard v. Bell Atlantic Corp., 946 F. Supp. 54, 77 (D.D.C. 1996). See also Paul v. Howard Univ., 754 A.2d 297, 307-08 (D.C. 2000). In the employment context, "the proof required to support a claim for intentional infliction of emotional distress is particularly demanding." Lockamy v. Truesdale, 182 F.Supp.2d 26, 28 (D.D.C. 2001); see also Paul, 754 A.2d at 307; Joyner v. Sibley Memorial Hosp., 826 A.2d 362, 373 (D.C. 2003). If it were not, "thousands upon thousands of employee terminations or other employment disputes in business and government would" give rise to the tort. Dale v. Thomason, 962 F. Supp. 181, 185 (D.D.C. 1997).

Indeed, even conduct that is *unlawful* under anti-discrimination statutes does not give rise to the tort of intentional infliction of emotional distress unless there is compelling evidence of "atrocious" and "utterly intolerable" conduct. See Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997); see also Anyaibe v. Gilbert Security Service, Inc., No. 94-2377, 1995 WL 322452, at *6 (D.D.C. 1995) (dismissing intentional infliction claim where supervisor frequently made derogatory remarks about plaintiff's national origin; plaintiff was terminated and replaced by a person born in the United States; and plaintiff never received a

promotion during his employment); Underwood v. Archer Mgmt. Servs., Inc.,
857 F. Supp. 96, 99 (D.D.C. 1994) ("discharge . . . is insufficient by itself to support a
claim for intentional infliction of emotional distress"). In this case, there is no
evidence of conduct on the part of RFA that went "beyond all possible bounds of
decency" or that could be "regarded as atrocious, and utterly intolerable in a
civilized community." To the contrary, Plaintiff's complaints about RFA (namely,
that he was denied employment as a full-time broadcaster on account of his gender
and had one of his contracts cancelled in retaliation for filing an EEOC charge) are
similar to the run of the mill employer-employee disputes which are routinely
dismissed under this cause of action. See Duncan v. Children's Nat'l Med. Ctr.,
702 A.2d 207, 211-12 (D.C. 1997). As a result, summary judgment is warranted on
plaintiff's claim of intentional infliction of emotional distress.

      With regard to the third element, the standard for showing that any
emotional distress allegedly experienced by plaintiff is sufficiently severe to survive
a motion for summary judgment is similarly very high:

> Intentional infliction of emotional distress exists] only where the
> emotional distress has in fact resulted and where it is severe . . . .
> [S]ome degree of transient and trivial emotional distress is a part
> of the price of living among people. The law intervenes only
> where the distress inflicted is so severe that no reasonable man
> could be expected to endure it.

See Camm v. Kennickell, No. 85-3844(CRR), 1990 WL 198621, at *4 (D.D.C. Nov. 20,
1990) aff'd, 946 F.2d 1563 (D.C. Cir. 1991) (quoting Restatement (Second) of Torts
§ 46, comment j). Plaintiff claims that RFA's alleged actions resulted in the

following: sleep loss, elevated blood pressure, anxiety, feelings of depression,[24] avoidance of social and religious activities, fights with girlfriend,[25] lack of self esteem, and weight loss.[26]  (See Than Dep. II at 293-94).  Plaintiff's claim cannot survive because, as numerous cases have held, a plaintiff cannot establish that the alleged injuries such as sleeplessness, a reluctance to socialize, and "stress" are sufficiently severe.  See, e.g., Paul, 754 A.2d at 307, n.22 (conclusory allegations that plaintiff suffered "from heightened levels of stress, high blood pressure, and disrupted sleep" as a result of defendants' allegedly outrageous conduct insufficient to establish "severe emotional distress"); Kitt v. Capital Concerts, Inc., 742 A.2d 856, 861-62 (D.C. 1999) (plaintiff's claim that he suffered "angst, sleeplessness and humiliation" as a result of defendant's conduct insufficient to warrant liability for intentional infliction of emotional distress).  This is true particularly because Plaintiff's condition was not serious enough to seek the help of a healthcare professional such as a psychologist or counselor.  See, e.g., Houlahan v. World Wide Ass'n of Specialty Programs & Schools, No. 04-01161 (HHK), 2006 WL 2844190, at *

---

[24]  Plaintiff's asserted depression is not clinical but, rather, a sense of frustration that he can't get a journalist job. (Nyein Dep. at 119). Note, however, that Plaintiff's inability to obtain a full-time broadcast journalism job is not restricted to RFA; Plaintiff tried for four years, from 2000 to 2004, to secure such a job with Voice of America. (See discussion, infra at pp. 36-37).

[25]  Plaintiff's live-in girlfriend testified that they fought primarily about her urging him to go to medical school. (Nyein Dep. at 38-39).

[26]  Plaintiff's weight has fluctuated over the years from a low of 160 to 170 in 1977, which remained the case in 2001, to a high of 200 in 2004. Plaintiff's weight at the time of his deposition was 180. (Than Dep. II at 300-01). Plaintiff's weight loss is negligible and is close to his average weight over the past nine years. Plaintiff's weight loss was welcomed by his live-in girlfriend who testified that he had lost the twenty pounds he had gained, but "still eats pretty well." (Nyein Dep. at 99-100).

9 (D.D.C. Sept. 29, 2006)( "[e]vidence of medical treatment might be necessary to prove a claim for intentional infliction of emotional distress"); <u>Abourezk v. New York Airline, Inc.</u>, 705 F.Supp. 656, 665 (D.D.C. 1989) <u>aff'd</u>, 895 F.2d 145 (D.C. Cir. 1990) (plaintiff's failure to seek physical or psychological treatment supported finding that plaintiff failed to establish that he suffered severe emotional distress). For these additional reasons, Plaintiff's intentional infliction claims must be dismissed.

**D.    Any damages for which Plaintiff may be eligible must be reduced because he failed to mitigate any damages and must be offset by the amount of any earnings received during the relevant period.**

Plaintiff is ineligible to receive any damages in connection with his claims because, as discussed above, he has not suffered any compensable injury. In the event that the Court finds that Plaintiff is eligible to receive any damages, the amount of such damages should be reduced due to Plaintiff's complete failure to mitigate damages by seeking alternative employment.

When measuring damages for an employer's breach of an employment contract, the compensation due to the employee is what he or she would have earned during the period of unemployment. <u>District of Columbia v. Jones</u>, 442 A.2d 512, 524 (D.C. 1982) (citations omitted). Thus, if an employee obtains another job or could get another job with reasonable effort "the income he obtains <u>or reasonably could obtain</u>" must be deducted from his damage award. <u>Brown v. Gino Morena Enters.</u>, 44 F. Supp.2d 41, 47 (D.D.C. 1999) (quoting <u>Jones</u>, 442 A.2d at 524) (emphasis added).

- 35 -

An employer is "not required to show that the [employee] would have obtained suitable employment, but only that the [employee] failed to act reasonably in pursing such employment.  Barbour v. Medlantic Mgmt. Corp., 952 F. Supp. 857, 864 (D.D.C. 1997) aff'd, 132 F.3d 1480 (D.C. Cir. 1997) (internal citation omitted). Plaintiff must make an honest effort to find work.  Id.  When a plaintiff lacks diligence in this search, it is irrelevant whether scarce available positions would have made it unlikely a position could have actually been obtained.  Id.

Plaintiff possessed the skills and experience to be hired in other jobs, but failed to pursue any employment opportunities outside of broadcast journalism. Plaintiff was trained as a medical doctor in Burma.  (Than Dep. I at 16-17.)  While his live-in girlfriend urged him to pursue a medical career (Nyein Dep. at 38-39), he did not do so.  (Thinn Dep. at 52-53).  Plaintiff also worked in a day care center from mid-1999 to September 2001[27].  (Than Dep. I at 35-36.)  Rite Aid employed Plaintiff for six to seven months in 2001 and 2002 as a cashier and Plaintiff received training as a pharmacy technician at CVS.  (Than Dep. I at 20-21, 30-36).  Plaintiff also freelances as an interpreter for Burmese people. (Id. at 33; Nyein Dep. at 31-32). This employment history indicates that Plaintiff possesses the requisite experience to reasonably obtain alternative employment and mitigate his damages.  Plaintiff's failure to pursue job opportunities in these areas, while focusing on employment in the radio broadcasting field, operates to disqualify him from eligibility for back pay damages.  See Barbour, 952 F. Supp. at 864.

---

[27]  Plaintiff was paid in cash for this work.  (Nyein Dep. 107-08).

The record shows that Plaintiff has a propensity both for not working all that hard and for quitting promising and remunerative jobs. Plaintiff quit his 30-35 hour a week job as a pharmacy technician at Rite Aid to work eight to sixteen hours per week as a contractor with RFA in 2002. (Than Dep. I at 21-22). While Plaintiff wanted a job in broadcasting, he is not entitled to a job of his choice but was instead required to take a reasonably obtainable job. See Barbour, 952 F. Supp. at 864. Plaintiff's failure to adjust his hours as a pharmacy technician at CVS to accommodate his far less than full-time contractor positions at RFA indicates his rather cavalier work ethic.[28]

Plaintiff's pursuit of a job at Voice of America is instructive. In 2000, he applied to work in the Burmese Service of Voice of America ("VOA") (Than Dep. I at 25-26), a job which he admits is comparable to working in RFA's Burmese Service. (Than Dep. II at 234-35). While he was not hired[29] (Than Dep. I at 87-88), he continued to pursue the job by updating his resume every six months and indicating a continuing interest in the job. (Id. at 27-28). The record establishes that Plaintiff totally abandoned seeking the full-time broadcaster position at VOA in 2004. Plaintiff admits that the last time that he informed VOA he remained interested in

[28]  Plaintiff's work ethic might be understandable in light of his living arrangements. Since 1999, he has lived with a woman, Yamin Nyein (Than Dep. I at 12-13), who pays his housing expenses (Nyein Dep. at 7, 28). She doesn't know what he does all day (id. at 46) and she remains the primary bread winner (id. at 42-43). Plaintiff contributes about $1,000 per month to pay for utilities and a car (id. at 59-61), an amount that exceeds his declared income as reflected on his individual tax returns (see Income Tax Returns filed by Khin Maung Than, attached hereto as Exhibit 28). Nyein does not know where he gets his money (id. at 59).

[29]  He asserts that female candidate was hired. (Than Dep. I at 87-88).

- 37 -

a job was late 2004. Id. By Plaintiff's own admissions, then, he failed to seek alternative employment and, thus, failed to mitigate his damages and should be disqualified from eligibility to recover any back pay damages. See Barbour, 952 F. Supp. at 864.

Since 2003, Plaintiff sought work only one other time, again at VOA. He applied for and was hired as a "purchase order vendor" at VOA to work as a broadcaster in the VOA's Burmese Service. At the time, he told Soe Thinn that he got the job at VOA and that he would not be writing features for RFA any more. (Than Dep. I at 51-52). After working for five days, Plaintiff quit the job at VOA, telling his supervisor that he had "a scheduling conflict." (Id. at 31, 50, 54). Plaintiff asserts that he quit the job on the advice of a legal aid attorney from an organization called Bread for the City from whom he sought advice on the filing of his EEOC charges because it would "not be good for [his] litigation." (Id. at 30; Than Dep. II at 285-87). RFA should not be held accountable for the erroneous advice Plaintiff received from this attorney. Plaintiff's further abandonment of an interim employment opportunity provides yet another basis on which to disqualify him form eligibility for back pay damages. [30]

---

[30]   Plaintiff is not left without a remedy as he could pursue a claim against Bread for the City for legal malpractice. Plaintiff appears to be able to meet the legal malpractice requirements: he had an attorney-client relationship with Bread for the City, his attorney allegedly neglected a reasonable duty in providing legal advice, and the attorney's negligence resulted in and was the proximate cause of a reduction in damages to Plaintiff. See M&S Bldg. Supplies, Inc. v. Keiler, 738 F.2d 467, 472 (D.C. Cir. 1984) (citations omitted). Plaintiff did not pay for this legal advice, but this does not change the fact that an attorney-client relationship existed. See Fort Myers Seafood Packers, Inc. v. Steptoe and Johnson, 381 F.2d 261, 262 (D.C. Cir. 1967).

In these circumstances, Plaintiff should be disqualified from eligibility for any back pay award.[31]

## IV.  CONCLUSION

For the foregoing reasons, Defendant Radio Free Asia respectfully requests that its Motion for Summary Judgment be granted.

Dated: December 22, 2006                    Respectfully submitted,

Gil A. Abramson (Bar # 237994)
HOGAN & HARTSON LLP
111 South Calvert Street
Suite 1600
Baltimore, MD 21202
(410) 659-2700

Gregory M. Petouvis (Bar # 477600)
HOGAN & HARTSON LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600

Counsel for Defendant
Radio Free Asia

---

[31]  Plaintiff's only other employment during the relevant back pay period was as an "interpreter". According to Plaintiff, he helps Burmese people two to four times a year, earning $300 each time, which he does not consider income. (Than Dep. at 33-34). As indicated previously, this income is not reflected in Plaintiff's income tax returns. In any event, any damages must also be offset by the amount of additional and, apparently, undeclared income that Plaintiff earns as a freelance interpreter. (See Than Dep. at 33). Damages must be reduced by any income actually earned. Jones, 442 A.2d at 524.

- 39 -

**EXHIBITS MEMORANDUM IN SUPPORT OF
DEFENDANT RADIO FREE ASIA'S
MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| 1 | Excerpts from Radio Free Asia Employee Handbook |
| 2 | Excerpts from October 3, 2006 deposition of Soe Thinn |
| 3 | Excerpts from Radio Free Asia's Objections and Responses to Plaintiff's First Set of Interrogatories |
| 4 | Excerpts from November 9, 2006 deposition of Nyein Shwe |
| 5 | Excerpts from November 10, 2006 deposition of Khin Maung Nyane |
| 6 | Excerpts from October 31, 2006 deposition of Susan Lavery Rogers |
| 7 | Excerpts from August 24, 2006 deposition of Khin Maung Than |
| 8 | October 1, 2002 Editorial Consultant Agreement |
| 9 | Affidavit of Tamara Bagley |
| 10 | January 18, 1999 letter from Khin Maung Than to Tamara Bagley |
| 11 | February 3, 2000 letter form Khin Maung Than to Tamara Bagley |
| 12 | January 28, 2001 e-mail from Khin Maung Than to Richard Richter |
| 13 | Excerpts from August 23, 2006 deposition of Khin Maung Than |
| 14 | October 28, 1998 letter from Khin Maung Than to Soe Thinn |
| 15 | March 9, 2001 letter from Khin Maung Than to Tamara Bagley |

| 16 | Khin Maung Than's 2001 Test Scores |
|----|-----------------------------------|
| 17 | Khin Maung Than's 1998 Test Scores |
| 18 | Affidavit of Dan Southerland |
| 19 | May 15, 2002 Consultant Agreement between Khin Maung Than and Radio Free Asia |
| 20 | Resume of Ko Ko Aung |
| 21 | Resume of Kyi Kyi Than |
| 22 | Resume of Tin Aung Cho |
| 23 | Resume of Maung Maung Nyo |
| 24 | February 23, 2004 letter from Khin Maung Than to the Chairman of the Broadcasting Board of Governors |
| 25 | October 26, 2006 deposition of Yamin Nyein |
| 26 | Affidavit of Ariah Francois |
| 27 | Relevant Portions of Timesheets of Khin Myo Thet, Tin Maung Than, and Khin Maung Than |
| 28 | Income Tax Returns filed by Khin Maung Than |