IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KHIN MAUNG THAN,　　　　　　　） | |
| 　　　　　）　 | |
| 　　Plaintiff,　　　　　） | |
| 　　　　　） | |
| 　　v.　　　　　） | |
| 　　　　　）　　Case No: 1:05-CV-01042 (RMU) | |
| RADIO FREE ASIA,　　　　） | |
| 　　　　　） | |
| 　　Defendant.　　　　） | |
| 　　　　　） | |

**PLAINTIFF DR. KHIN MAUNG THAN'S MEMORANDUM IN OPPOSITION TO
DEFENDANT RADIO FREE ASIA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dr. Khin Maung Than ("Dr. Than") submits the following in opposition to

Defendant Radio Free Asia's ("RFA") motion for summary judgment.  In seeking summary

judgment, RFA must establish that, when considering the evidence in the light most favorable to

Dr. Than, there are no genuine issues of material fact and RFA is entitled to judgment as a matter

of law.  RFA cannot come close to satisfying this standard.  As discussed below, any reasonable

jury could find that RFA discriminated on the basis of gender when hiring an unqualified female

over three male candidates and that the post hoc explanations offered by RFA after this hiring

decision are pretextual and disingenuous.  Likewise, a reasonable jury could conclude that

RFA's termination of Dr. Than shortly after RFA received notice of his Equal Employment

Opportunity Commission ("EEOC") gender discrimination charge constitutes retaliatory activity

under Title VII of the Civil Rights Act, and RFA's explanations again amount to pretext.

RFA attempts to manufacture a record that is "undisputed," and upon which this Court

might consider its motion.  Contrary to RFA's assertions, however, the record is hardly

1

"undisputed." Rather, virtually every instance at which RFA asserts the record is undisputed or not contradicted, the record belies such a claim, including the following:

***Whether RFA offered the position of full-time broadcaster in 2003 to an unqualified female, over three more qualified males, is a disputed issue of material fact.*** Although RFA represents the record on this issue as "undisputed," such a claim ignores not only contradictory testimony in the record, but also prior statements RFA itself has made when responding to Dr. Than's charge of gender discrimination. For example, RFA boldly asserts that "[t]he record is *undisputed* that, after interviewing four candidates, [Burmese Service Director] Soe Thinn and [Burmese Service Deputy Director] Nancy Shwe offered the full-time broadcaster position to a male, Tin Aung Cho." RFA Br. at 16 (emphasis added). When responding to the EEOC notice of Dr. Than's initial gender discrimination charge, however, RFA was clear that exactly opposite was true and that Mr. Cho was not offered any position until *after* Kyi Kyi Than had been hired:

> *Mr. Cho was offered a position which had become vacant when another Broadcaster in the Burmese Service quit <u>after</u> Kyi Kyi Than was hired.*

Letter from G. Abramson on behalf of RFA to EEOC (October 1, 2004) at 4 n.3, RFA-00478 ("Oct. 1, 2004 RFA Response") (emphasis upon "after" in original, other emphases added) (Ex. 1)[1]; *see also infra* at 20-21. This critical, and disputed, issue of fact goes to the heart of Dr. Than's claims and defeats summary judgment.

***Whether RFA had a policy of screening all candidates for political bias is a disputed issue of material fact.*** RFA likewise argues that "the record is *undisputed* that [Dr. Than] disqualified" himself from being employed as a full-time broadcaster because, during the

---

[1]     Citations to "Ex. __" are citations to Exhibits to the Declaration of David E. Kouba in Support of Plaintiff's Memorandum in Opposition to Defendant Radio Free Asia's Motion for Summary Judgment, filed herewith.

interview process, he responded to one question allegedly related to political bias incorrectly. RFA Br. at 2 (emphasis added). This after-the-fact explanation, however, again cannot survive scrutiny. In fact, even an RFA senior editor -- interviewed and hired personally by the Director Thinn -- who established this alleged "policy" -- testified that he was never asked any question similar to the one relied upon by RFA. Deposition of Khin Maung Nyane ("Nyane Depo.") at 8 (Ex. 2). Moreover, Deputy Director Shwe, when asked about Dr. Than's interview shortly thereafter, explained he had done fine, had no weaknesses, and never mentioned any concerns regarding political bias. Affidavit of Khin Maung Than ("Dr. Than Aff.") ¶ 22 (Ex. 3). Nor can RFA offer any documentation that such a policy existed prior to this lawsuit. *See infra* at 21-25.

**Whether RFA had knowledge of Dr. Than's claims of discrimination prior to his termination is a disputed issue of material fact.** RFA asserts that "the record is undisputed that the decision makers in the Burmese Service . . . were not aware that Plaintiff had filed an EEOC charge at the time the decision was made not to renew the voicing contracts." RFA Br. at 29. This assertion is hardly "uncontroverted," however. First, the identity of these "decision makers" is a disputed issue of fact, with different RFA employees offering conflicting testimony about how this decision was made and who was involved. *See infra* at 31-32. Second, although when seeking summary judgment, RFA claims decisions regarding contracts are made in August, RFA Br. at 30, RFA's Director Thinn testified that the decision-making process does not *begin* until September. *See, e.g.*, Deposition of Soe Thinn ("Thinn Depo.") at 68 (Ex. 4). Third, Dr. Than did not learn of this decision until October 2 -- after RFA already had filed an official response to the EEOC charge. *See* Dr. Than Aff. at ¶¶ 26-27; Oct. 1, 2004 RFA Response.

**Whether RFA terminates voice consultants to hire "new voices" is a disputed issue of material fact.** When claiming that Dr. Than's EEOC complaint was not a factor in its decision

to terminate Dr. Than, RFA argues that "[t]he testimony is *undisputed* that Burmese Service Voice Contractors remain under contract only for a maximum of two or three years and are replaced so that fresh voices can be hired." RFA Br. at 6 (emphasis added). Again, the record demonstrates not the presence of such a practice, but instead, that 2003 was practically the only year during which voice consultants were terminated for "new voices." In addition, RFA apparently does not have a similar "new voice" policy for other positions with broadcasting responsibilities. Likewise, despite RFA's bare claim that it is "stated practice" to terminate voice consultants on the basis of wanting "new voices," RFA offered no evidence that any such practice existed prior to RFA's termination of Dr. Than. *See infra* at 30-31.

*     *     *

As discussed below, when considering together "plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and other evidence" in this case, *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 73 (D.D.C. 2006), a reasonable jury certainly could conclude that RFA's decision to hire a female that failed to satisfy RFA's minimum qualifications, over a qualified male, was based on gender. Likewise, a jury could find RFA's decision to terminate Dr. Than within weeks of Dr. Than's EEOC charge of gender discrimination was retaliatory. And, rather than exonerate RFA, when analyzed against the record in this case, RFA's pretextual, post hoc explanations for these two events -- at a minimum -- only introduce additional issues of fact to be resolved by a jury. For all of these reasons, summary judgment on Dr. Than's discrimination and retaliation claims should be denied. In addition, RFA's argument concerning damages is inappropriate for summary resolution. Finally, whether Dr. Than can demonstrate intentional infliction of emotional distress requires resolution of issues of material fact and also is inappropriate for summary judgment.

4

## STATEMENT OF FACTS

**I.**     **Dr. Than's Background Prior To Working At RFA**

Dr. Than was born and educated in Burma, but thereafter sought and was granted political asylum in the United States, to which he immigrated in 1997. *See* Deposition of Khin Maung Than ("Dr. Than Depo.") at 15-17 (Ex. 5); Dr. Than Aff. ¶ 2. While in Burma, Dr. Than studied medicine at Institute of Medicine-1, Rangoon, Burma and became a doctor. Dr. Than Aff. at ¶ 3; Than Depo. at 16-17. In addition to studying medicine, while in Burma, Dr. Than held various journalism positions. Dr. Than Aff. ¶¶ 4-6. From 1984 to 1988, Dr. Than was a contributing editor to the Institute of Medicine-1 students' magazine, where he wrote and edited articles for the magazine. *Id.* ¶ 4; Resume of Khin Maung Than, Than40 ("Than Resume") (Ex. 6). In addition, while serving as a contributing editor for the Institute of Medicine-1 students' magazine, Dr. Than made translations from Burmese to English, and from English to Burmese. Dr. Than Aff. ¶ 4; Than Resume. The Institute of Medicine-1's students' magazine published short stories, long stories, news articles about recent developments in medicine, cartoons, poems, advertisements, and other features. *Id.* The magazine published sections in both Burmese and English, and because of the amount of materials submitted, not all submissions could be published. *Id.* Accordingly, Dr. Than and the magazine's staff were required to thoroughly read and edit submissions to the magazine prior to publication. *Id.*

From 1990 to 1994, Dr. Than contributed original and translated articles to certain Burmese publications. *Id.* ¶ 5; Than Resume. In particular, Dr. Than wrote articles related to health issues and contributed to a Burmese health magazine that was published monthly. Dr. Than Aff. ¶ 5. Some of these articles were based on Dr. Than's experience as a physician. *Id.* Other submissions were translations from international news magazines. *Id.*

Moreover, from 1995 until beginning to work at RFA, Dr. Than contributed articles to certain United States publications. *Id.* ¶ 6; Than Resume. In preparing these articles, Dr. Than read and gathered information relating to technology and health from newspapers, magazines, television, and the internet. Dr. Than Aff. ¶ 6. Dr. Than translated such information, and based upon what he gathered, wrote articles in Burmese. *Id.*

## II.    Dr. Than's Employment At RFA As Both A Voice Consultant And An Editorial Consultant

Dr. Than began working at RFA in May 2002 as a voice consultant. Thinn Depo. at 56-57; Dr. Than Aff. ¶ 14. As a voice consultant, Dr. Than was responsible for translating newswires originally written in English into Burmese and into a format that could be broadcast over the radio. Thinn Depo. at 39-40; RFA Br. at 5; Dr. Than Aff. ¶ 14. Because the content of written newswires and broadcasted stories differ from one another, this task was more complicated than simply translating these stories verbatim. Dr. Than Aff. ¶ 14. In addition to writing news stories, after these stories were finalized in Burmese, Dr. Than also was responsible for reading these stories over the air. Thinn Depo. at 39-40; RFA Br. at 5.

With respect to his work as a voice consultant, the testimony demonstrates that his work performance always has been satisfactory. For example, Dr. Than's broadcasts were never the subject of complaints from listeners. *See, e.g.,* Nyane Depo. at 20. And RFA supervisors testified that as a voice consultant, Dr. Than also always reported to work on time and always completed his stories on time. *See, e.g.,* Nyane Depo. at 16; Deposition of Nancy Shwe ("Shwe Depo.") at 16 (Ex. 7). And although, on occasion, Dr. Than required an editor's assistance in order to complete a story, Director Thinn testified that Dr. Than needed no more assistance than was normal and customary for all voice consultants. Thinn Depo. at 72 ("Everybody needs help.

There isn't anybody . . . who never had help."). Moreover, the record demonstrates that Dr. Than got along with co-workers. *See, e.g.,* Nyane Depo. at 16; Thinn Depo. at 72.[2]

Dr. Than also has been an editorial consultant since 2002. Dr. Than Aff. ¶ 15; RFA Br. at 9. As an editorial consultant, Dr. Than was responsible for "writing . . . weekly features on a weekly basis with respect to the topic that he . . . proposed." Thinn Depo. at 74; RFA Br. at 4. As with his position as a voice consultant, Dr. Than had broadcasting responsibilities in this position, and, in particular, was required to record his weekly feature for broadcast by RFA. RFA Br. at 4; Dr. Than Aff. ¶ 15. And again, the record in this case demonstrates the Dr. Than always performed his job adequately. *See, e.g.,* Nyane Depo. at 32-34; Shwe Depo. at 35-36.

In fact, Intermedia – a company specializing in global research – conducted a survey among Burmese listeners and concluded that Dr. Than's weekly feature was "[o]ne of the RFA's best non-current affairs programs." Intermedia Evaluation of Science & Technology (Jan. 18, 2003), Than91 ("Intermedia Evaluation") (Ex. 8).[3] Indeed, these listeners explained that Dr. Than "was lively, confident, articulate, energetic – and pronounced English names correctly." *Id.* Director Thinn agreed with this evaluation, conceding that Dr. Than was "articulate and confident" and that he pronounced English names correctly "most of the time." Thinn Depo. at 88-89. Likewise, both Deputy Director Shwe and Senior Editor Nyane agreed

---

[2]     Although RFA notes that it had to leave messages for Dr. Than when it called him, Deputy Director Shwe conceded that he always returned the messages that were left. *See, e.g.,* Shwe Depo. at 31.

[3]     According to its website, "InterMedia is a leader in providing global research, evaluation and consulting in support of the international media and development community" that helps "clients turn public attitudes, opinions and behaviors into market intelligence and strategic communications solutions in transitional and developing countries worldwide." *See* Intermedia website, http://www.intermedia.org/about_us/index.html (Ex. 9)

that Dr. Than "was lively, confident, articulate, energetic, and pronounced English names correctly."  Shwe Depo. at 36; Nyane Depo. at 37-38.

## III.    RFA's Decision To Hire A Female As A Full-Time Broadcaster In 2003 Instead Of One Of Several More Qualified Male Applicants

In 2003, RFA's Burmese Service determined it needed to hire a full-time broadcaster.  As part of the application process, RFA published a job description listing the minimum qualifications that applicants should possess.  *See, e.g.*, Shwe Depo. at 64; Thinn Depo. at 119. This description provided as follows:

> Radio Free Asia:  Job Announcement
>
> Journalist
>
> (International Broadcaster)
>
> International radio service seeks journalist(s) with background and experience in East and South East Asia.  Candidates must fluently speak and write Burmese.
>
> MINIMUM QUALIFICATIONS
>
> Bachelors degree from an accredited college or university, degree in journalism or related field preferred.  One year experience broadcast and/or specialized journalism.

Radio Free Asia:  Job Announcement, RFA-00490 ("RFA Job Announcement") (Ex. 10).[4]

Applicants for this position were given a test designed to evaluate their potential to be full-time broadcasters for the Burmese Service.  *See, e.g.*, Thinn Depo. at 29; RFA Br. at 10. Based on the results of these tests, RFA decided to interview certain individuals.  *See, e.g.*, Thinn Depo. at 120-21; RFA Br. at 11.  In particular, for this position, RFA interviewed four individuals:  Dr. Than, Dr. Maung Maung Nyo, Mr. Tin Aung Cho, and Ms. Kyi Kyi Than.  *See,*

---

[4]    Although RFA argues that it has "accepted the fact that most applicants will not have any broadcast experience," RFA Br. at 10 n.9, the fact that it continues to advertise such experience as a "minimum qualification" undermines this claim.

*e.g.*, RFA Br. at 11. At the time of his interview, Dr. Than had worked at RFA for over a year as both a voice consultant and as an editorial consult. *See, e.g.*, Dr. Than Aff. ¶¶ 14-15. During this time, listeners to RFA's Burmese Service praised Dr. Than as "lively, confident, articulate [and] energetic," and explained that he "pronounced English names correctly." Intermedia Evaluation. Indeed, Dr. Than's program was "[o]ne of the RFA's best non-current affairs programs." *Id.* In addition, Dr. Than had several years of other journalism experience prior to working at RFA. *See supra* at 5-6 (describing journalism experience before employment at RFA). Following his interview, Dr. Than asked Deputy Director Shwe how he had done. Dr. Than Aff. ¶ 22. Deputy Director Shwe responded that he had done fine and that he did not have any weaknesses. *Id.*

In contrast to Dr. Than, at the time of her interview, Ms. Kyi Kyi Than did not satisfy the "minimum qualifications" in the job description published by RFA when seeking full-time broadcasters. Indeed, internal company documents described her as possessing "no broadcasting or journalism experience" and likewise concluded she was not qualified. Applicant Review Sheet - Ms. Kyi Kyi Than, RFA-00062 ("Kyi Kyi Than Review") (Ex. 11). Likewise, Ms. Kyi Kyi Than's college education focused upon finance and accounting, and not journalism or broadcasting. Kyi Kyi Than Resume and Cover Letter, RFA-00103-04 (Jun. 4, 2003) ("Kyi Kyi Than Resume") (Ex. 12).[5] Despite Ms. Kyi Kyi Than's qualifications or lack thereof, RFA hired Ms. Kyi Kyi Than as a full-time broadcaster in October 2003.

---

[5] Dr. Than was not the only male interviewed whose qualifications exceed Ms. Kyi Kyi Than's. For example, Dr. Maung Maung Nyo possessed a Diploma in Journalism and had been the editor of a magazine for over six years. Maung Maung Nyo Resume, RFA-00353-54. (Ex. 13). He likewise had been a contributor to the Democratic Voice of Burma. *Id.*

Nothing in RFA's published job qualifications contained any reference to Aung San Suu Kyi specifically, or even political bias generally. Nor was possible political bias otherwise discussed with applicants prior to seeking employment or interviewing at RFA. *See, e.g.*, Shwe Depo. at 72-73. Moreover, RFA possesses no written materials showing that RFA bases its hiring decisions on an applicant's opinion of Aung San Suu Kyi. *Id.* In fact, not all employees within the Burmese Service were asked any questions regarding Aung San Suu Kyi during the interview process. For example, Senior Editor Nyane, who was interviewed by Director Thinn, testified that he was not asked anything about Aung San Suu Kyi. *See, e.g.*, Nyane Depo. at 8. Indeed, the alleged policy that interviewees be asked about Aung San Suu Kyi specifically, or even political bias in general, does not appear to have existed before 2003. *See id.*; Thinn Depo. at 157-58. Moreover, Dr. Than has had numerous conversations with Deputy Director Shwe following his 2003 interview, and during none of these conversations did Deputy Director Shwe explain or otherwise refer to RFA's concerns about a possible political bias. Dr. Than Aff. ¶ 22-23.

## IV.    RFA's Termination Of Dr. Than Within Weeks Of Notice Of Dr. Than's EEOC Complaint

In April 2004, Dr. Than contacted the Washington EEOC's field office, expressing concerns about the hiring practices at RFA, and, in particular, that such practices might be discriminatory. Dr. Than Aff. ¶ 24. Later that year in June, he attended an EEOC intake interview and completed a "Charge Questionnaire." *Id.* And in August, his charge against RFA was officially issued. Notice of Charge of Discrimination (Aug. 19, 2004), RFA-00462 ("Aug. 19, 2004 Notice") (Ex. 14). At some point in either August or September 2004, RFA received notice of Dr. Than's charge with the EEOC. The company filed a response to these charges on October 1, 2004. *See* Oct. 1, 2004 RFA Response.

In early October 2004, RFA informed Dr. Than that his voice consultant contract was being terminated. Than Aff. ¶¶ 26-27. In particular, on October 2, 2004, Dr. Than went to RFA's studio to record his weekly feature, as he had been doing since he first became an editorial contractor. *Id.* ¶ 26. Upon arrival at RFA, Dr. Than learned his access card had been cancelled, and as a result, Dr. Than had to request assistance to enter the building. *Id.* After arriving at the Burmese Service area of RFA's offices, Dr. Than saw Director Thinn. *Id.* ¶ 27. Director Thinn requested that Dr. Than accompany him into a separate room, and, thereafter, informed Dr. Than for the first time that his voice consultant contract had been terminated. *Id.* Director Thinn explained that the source of the decision to terminate Dr. Than was "senior management." *Id.*; *see also*, *e.g.*, Thinn Depo. at 92-93. Prior to this time, Dr. Than had received no notice that his voice consultant contract would not be renewed. Than Aff. ¶ 27. Further, RFA never provided any written notice that Dr. Than's voice consultant contract was being terminated. *Id.* ¶ 28. And at no point prior to October 2004 did RFA tell Dr. Than his performance was not satisfactory. *Id.*[6]

RFA has no written policy documenting either a desire to find new voices or the potential for an individual to become a full-time broadcaster as a consideration when determining whether to terminate or renew a voice consultant's contract. Nyane Depo. at 27. In addition, RFA apparently does not have a similar "new voice policy" with respect to editorial consultants or full-time broadcasters, despite the fact these positions also involve broadcasting on the air. Moreover, aside from the possibility of one additional individual in 2002, RFA has not

---

[6]     In addition to being terminated, during September, Dr. Than's hours as a voice consultant had been significantly reduced by RFA. *Id.* ¶ 24.

terminated any individual because it wanted new voices besides those it terminated in 2004.

Shwe Depo. 54-55; Thinn Depo. 99-100.

## ARGUMENT

### I.    Summary Judgment Standard

Under Rule 56(c), summary judgment is only appropriate when "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). RFA correctly notes that "disputes of fact that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment." RFA Br. at 15-16. When considering motions for summary judgment under Rule 56, as a general matter, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [and thus] . . . [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, e.g., Worth v. Jackson*, 377 F. Supp. 2d 177, 180-81 (D.D.C. 2005) ("When ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party.") (citation omitted). Moreover, courts have routinely recognized that where -- as here -- questions concerning subjective motives and intent are at issue, summary judgment is not appropriate. *See, e.g., Weidel v. Ashcroft*, 234 F. Supp. 2d 5, 8 (D.D.C. 2002) (stating "federal courts have persistently indicated that questions of motive and intent cannot be resolved on summary judgment"); *Higbee v. Billington*, 246 F. Supp. 2d 10, 15 (D.D.C. 2003). "[M]ost basically, the opponent of a summary judgment motion meets [his] burden by presenting a witness who will testify in support of a certain material proposition, unless, of course, the substance of the

testimony is factually impossible . . . ." *Weidel*, 234 F. Supp. 2d at 7 (D.D.C. 2002) (citation and quotation omitted).

At the summary judgment stage in an employment discrimination case, "the question for the court to resolve is whether -- taking into consideration the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence -- a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a prohibited reason (that is, either because of plaintiff's sex or because [h]e engaged in a protected activity.)" *Kalinoski*, 435 F. Supp. 2d at 72. As discussed below, a reasonable jury could conclude that RFA discriminated and retaliated against Dr. Than. Thus, Dr. Than can satisfy his burden in opposing summary judgment with respect to establishing prima facie gender discrimination and retaliation claims. Likewise, Dr. Than can demonstrate that material issues of fact exist regarding his claim for intentional infliction of emotional distress, and as a result, RFA's motion for summary judgment on this claim also should be denied. Finally, because resolution of the appropriate amount of damages entails factual inquiries, the issue of damages is not appropriate for summary resolution.

## II.    A Reasonable Jury Can Find RFA Committed Gender Discrimination When Hiring Ms. Kyi Kyi Than

When viewing the evidence in the light most favorable to Dr. Than -- as required on a motion for summary judgment -- a reasonable jury could find that RFA engaged in gender discrimination. "To establish a *prima facie* case of unlawful discrimination under Title VII in a non-selection claim, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the position she sought but was rejected; and (3) the employer either filled the position with another applicant or continued to try to fill it." *Gipson v. Wells Fargo N.A.*, --- F. Supp. 2d ----, 2006 WL 3040647, at *2 (D.D.C. Oct. 24, 2006); *see also*, *e.g.*, *Tex.*

*Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."). In addition, a reasonable jury could find that any nondiscriminatory reason offered by RFA for its hiring decision was mere pretext for discrimination. *See, e.g.*, *Gipson*, 2006 WL 3040647, at *2-4.

 As discussed below, there is ample evidence in the record to satisfy Dr. Than's burden in opposing summary judgment and to demonstrate that RFA's hiring decision constitutes gender discrimination. Indeed, a reasonable jury could find RFA's decision to hire an unqualified female over a qualified male gives rise to an inference of discrimination. Moreover, a jury could plainly find that RFA's reason that it did not hire two candidates due to a perceived "political bias" amounts to mere pretext. And RFA's argument that it hired a male before hiring Ms. Kyi Kyi Than is not only disputed in the record (despite RFA's statements to the contrary) -- it is flatly inconsistent with RFA's own statements to the EEOC in connection with Dr. Than's charge of gender discrimination, and, likewise, is pretext.

## A. A Reasonable Jury Could Infer That RFA's Decision To Hire An Unqualified Female Over Three Males Was Based On Gender

 To initiate its process for hiring full-time broadcasters, RFA published a job announcement including a description of certain basic qualifications associated with that position. *See, e.g.*, RFA Job Announcement; *see also*, *e.g.*, Shwe Depo. at 64. Included within its 2003 job advertisement for a full-time broadcaster were the minimum qualifications that any potential candidate should possess:

   MINIMUM QUALIFICATIONS

> . . . Bachelors degree from an accredited college or university,
> degree in journalism or related field preferred. *One year*
> *experience broadcast and/or specialized journalism.*

RFA Job Announcement (emphasis added); *see also* Shwe Depo. at 64 (testifying that "the job

announcement list[s] the minimum qualifications" for the position of full-time broadcaster).

RFA attempts to undermine reliance upon these minimum qualifications by asserting that

the description is "generic" and does not list actual requirements. RFA Br. at 10 n.9. Contrary

to RFA's claims, however, the qualifications are specific to the Burmese Service, as they specify

candidates should be *fluent in Burmese*. *See* RFA Job Announcement. For this reason, Tamara

Bagley's claim that "[t]he advertisement was not tailored to meet the needs of the particular

language services" is plainly incorrect. *See* Affidavit of Tamara Bagley ¶ 4 (RFA Ex. 9). In

addition, RFA offers no explanation as to why Director Thinn could not edit the description

before sending them to various publications, as he apparently was responsible for doing. *See,*

*e.g.*, Email from Soe Thinn to editor@burmanet.org, RFA-00436 (Feb. 20, 2004) (Ex. 15)

(submitting the same job announcement for a full-time broadcaster opening in 2004). Moreover,

while a degree in journalism is "preferred," nothing indicates that the requirement of journalism

experience is a "preference" rather than an absolute requirement. *See* RFA Job Announcement.

At a minimum, whether the criteria listed in this advertisement were intended to be requirements

is yet another fact question requiring resolution by a jury and not on summary judgment.

As RFA correctly notes, four candidates were chosen for interviews – one female,

Ms. Kyi Kyi Than, and three males. RFA Br. at 11. Despite the above requirements identified

by RFA when seeking full-time broadcasters, Ms. Kyi Kyi Than lacked anything resembling

"experience [in] broadcast and/or specialized journalism." Resume of Kyi Kyi Than, RFA-

00103 (June 4, 2003) ("Kyi Kyi Than resume") (Ex. 16). To the contrary, the experience on Ms.

Kyi Kyi Than's resume instead is generally retail experience and accounting, project management, or secretarial work. *Id.* Notably, an "Applicant Review Sheet" for Ms. Kyi Kyi Than produced by RFA reveals that during the application process, RFA concluded that Ms. Kyi Kyi Than had "no broadcast or journalism experience" and was not "qualified" for the position of full-time broadcaster based on her resume. Kyi Kyi Than Review; *see also, e.g.,* Shwe Depo. at 81 (noting that Applicant Review Sheets are used when determining whether to interview an individual).[7]

In contrast to Ms. Kyi Kyi Than, Dr. Than had worked as a voice consultant, broadcasting for RFA for over a year, and also was working as an editorial consultant. That Dr. Than's work was exceptional is demonstrated by the responses of Burmese listeners participating in an independent survey conducted by Intermedia. According to this survey, Dr. Than's program was "[o]ne of the RFA's best non-current affairs programs," and Dr. Than himself "was lively, confident, articulate, energetic." Intermedia Evaluation; *see also supra* at 7-8 (Deputy Director Shwe and Senior Editor Nyane agreeing with this evaluation).[8] Not only did Dr. Than perform his responsibilities well during his tenure at RFA, as the Intermedia survey results and testimony of Senior Editor Nyane and Deputy Director Shwe demonstrate, he had already acquired substantial experience in journalism while in Burma. In particular, Dr. Than was a contributing editor for a magazine for four years. Dr. Than Aff. ¶ 4. Dr. Than likewise contributed translated stories and other pieces to Burmese publications for four years, and to United States publications for five years after that. *Id.* ¶¶ 5-6; *see also supra* at 5-6.

---

[7]  Although RFA produced an Applicant Review Sheet for Ms. Kyi Kyi Than, no such document was provided for the other 2003 applicants.

[8]  These individuals' agreement with this very favorable review undermines the conclusion argued by RFA in footnote 19 of its brief that Dr. Than was "adequate." RFA Br. at 21 n. 19.

Moreover, in addition to lacking the requisite journalism experience, the record indicates Ms. Kyi Kyi Than also did not satisfy another fundamental requirement listed in RFA's job listing: "[w]orking knowledge of English required." RFA Job Announcement. Indeed, a senior editor at RFA testified that "her comprehension of English language was weak," and "she made mistakes in her translations." Nyane Depo. at 44-46. This view was shared by all of the editors:

> Q:    And what were other editors' opinion of Kyi Kyi Than's job performance?
>
> A:    We all had the same views.
>
> Q:    And those views were that her translations were below average?
>
> A:    Yes . . .

Nyane Depo. at 47-48. Again, in contrast, RFA's Burmese audience praised Dr. Than's ability speaking English, noting that he "pronounced English names correctly." Intermedia Evaluation.[9] And again, Deputy Director Shwe and Senior Editor Nyane agreed with this conclusion. *See supra* at 7-8. Indeed, even Director Thinn acknowledged that Dr. Than pronounced English names correctly "most of the time." Thinn Depo. at 88-89.

Despite lacking RFA's minimum experience requirements, despite RFA's apparent conclusion she was not qualified, and despite her apparent weakness with respect to comprehension of English, Ms. Kyi Kyi Than ultimately was offered the position of full-time broadcaster at RFA – a position she left within months and during which she was subject of

---

[9]    Dr. Than was not the only more qualified male that RFA passed over when hiring a female that failed to meet the company's own published qualifications. Indeed, RFA likewise hired Ms. Kyi Kyi Than over two other male candidates who appear more qualified. For example, Dr. Maung Maung Nyo had been working for over two years as an Outside Contributor for the Democratic Voice of Burma in Oslo. RFA-00353. He also had a decree in journalism from the Thomson Foundation. Even RFA concedes that Dr. Nyo's qualifications exceeded those of Ms. Kyi Kyi Than. RFA Br. 14 n.13.

complaints from listeners.  *See, e.g.*, Nyane Depo. at 45.  And despite RFA's arguments that the

fact Ms. Kyi Kyi Than worked there for less than a year is irrelevant, RFA Br. at 23, this

evidence is relevant with respect to establishing pretext.  As the D.C. Circuit has explained:

> Evidence indicating that an employer misjudged an employee's
> performance or qualifications is, of course, relevant to the question
> whether its stated reason is a pretext masking prohibited
> discrimination . . . if the employer made an error too obvious to be
> unintentional, perhaps it had an unlawful motive for doing so.

*Fischbach v. D.C. Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996); *see also infra* 19-

26 (discussing why RFA's offered reasons for this hiring decision are pretextual).

RFA's decision to hire a female -- who by RFA's own terms was unqualified -- over

more highly qualified male candidates creates an inference of discrimination based upon gender.

In particular, "when an employer acts contrary to his apparent best interest in promoting a less-

qualified minority applicant, it is more likely than not that the employer acted out of a

discriminatory motive."  *Harding v. Gray*, 9 F.3d 150, 153-54 (D.C. Cir. 1993); *see also, e.g.*,

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985).  For this reason, the Court should

allow Dr. Than to have a jury consider the above record and reach its own decision concerning

RFA's motives for hiring Kyi Kyi Than over several, unequivocally more qualified candidates.

As noted in *Kalinoski*, "[p]laintiff has produced evidence from which a jury might conclude that

defendant chose a significantly less qualified individual . . . and thus that defendant's proffered

rationale for denying plaintiff the position is pretextual."  435 F. Supp. 2d at 73; *see also, e.g.*,

*Choates v. Powell*, 265 F. Supp. 2d 81, 95 (D.D.C. 2003) ("Where a plaintiff's qualifications are

so vastly superior than the selectee's, this may be considered evidence of pretext, casting doubt

on the legitimate, non-discriminatory explanation offered by the employer and creating a question of material fact.").[10]

### B.     RFA's Arguments That It Hired Kyi Kyi Than For Reasons Unrelated To Gender Are Unpersuasive

Even beyond Dr. Than's prima facie case, in *Aka*, the D.C. Circuit made clear that "[a] plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate.  The plaintiff can instead seek to expose other flaws in the employer's explanation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998).  RFA offers two principal reasons why, despite Dr. Than's prima facie case, it is entitled to summary judgment with respect to Dr. Than's gender discrimination claims.  Each of these reasons, however, is riddled with flaws, pretextual and, at a minimum, creates additional issues of material fact defeating summary judgment.

As a general matter, once an employee sets forth a prima facie case of employment discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection." *Kinsey v. First Reg'l Secs. Inc.*, 557 F.2d 830, 836 (D.C. Cir. 1977).  Even if employer offers such a reason, however, the inquiry, however, does not end at this point; rather, "[p]laintiff may rebut by showing that defendant's stated reason was in fact pretext." *Id.*  Indeed, as this Court has explained, an employee in a discrimination case can survive summary judgment if they "show that a jury could conclude by a preponderance of the evidence that the asserted reason is a pretext." *Barry v. United States Capitol*, 2005 WL 1026703, at *4 (D.D.C. May 2, 2005); *see also, e.g., Cones v. Shalala*, 199

---

[10]    Given that, unlike Dr. Than, Ms. Kyi Kyi Than failed to meet several of RFA's published qualifications for full-time broadcasters, RFA's argument that Dr. Than's gender discrimination claim is based "solely on a single fact:  that Kyi Kyi Than is a woman," RFA Br. at 18, cannot withstand scrutiny.

F.3d 512, 520 (D.C. Cir. 2000). And pretext "may be established . . . indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

<blockquote>

**1.     RFA's Argument That It Hired A Male
     Is Incorrect And Inconsistent With Prior Arguments**
</blockquote>

RFA places great weight upon its assertion, with respect Dr. Than's gender discrimination claim, that "[b]ased upon the applicants' performance during their interviews, Director Thinn and Deputy Director Shwe *selected Tin Aung Cho, a male, for the position*." RFA Br. at 13. According to RFA, "[t]he record is *undisputed* that, after interviewing four candidates, Soe Thinn and Nancy Shwe offered the full-time broadcaster position to a male, Tin Aung Cho." *Id.* at 16 (emphasis added). This argument is not only disputed by the record, it is contrary to RFA's own formal statements regarding its decision to hire Ms. Kyi Kyi Than. Oct. 1, 2004 RFA Response. In particular, when responding to official notice of Dr. Than's charge of gender discrimination, RFA could not have been clearer that Mr. Cho was not offered a position at RFA until *after* Ms. Kyi Kyi Than had been hired:

> *Mr. Cho was offered a position which had become vacant when another Broadcaster in the Burmese Service quit <u>after</u> Kyi Kyi Than was hired.*

Oct. 1, 2004 RFA Response (emphasis on "after" in original, other emphasis added). This statement is consistent with the timeline offered by RFA in this response to the EEOC. RFA plainly states that "[o]n *October 21, 2003*, a decision was made to hire Kyi Kyi Than for the International Broadcaster position in the Burmese Language Service. *Id.* (emphasis added); *see also* Than Aff. ¶¶ 19-21. In the same letter, RFA also explains that "[t]he only person hired into the Burmese Service in *November 2003* was Mr. Tin Aung Cho." *Id.* (emphasis added). That

Ms. Kyi Kyi Than was hired before Mr. Cho is consistent with RFA's communications with employees in 2003. *See* Than Aff. ¶¶ 19-21.

RFA's earlier statement, made before Dr. Than filed his complaint in D.C. Superior Court, cannot be reconciled with its more recent claim that a male -- and not Kyi Kyi Than -- first was offered the position of full-time broadcaster. RFA Br. at 13. Based on these statements, RFA's new argument that it is "undisputed" that it first offered the job to a male instead of Ms. Kyi Kyi Than cannot withstand scrutiny. *See Aka*, 156 F.3d at 1293. RFA's 180 degree change in position supports an inference of discrimination and creates additional material issues of fact defeating summary judgment.[11]

### 2. RFA's Argument That It Did Not Hire Dr. Than Based On Political Bias Is Pretext

In addition to arguments focused upon the supposed job offer to Mr. Cho, RFA also offers the explanation that its hiring decision was based on the fact that Dr. Than allegedly exhibited a political bias during the interview process based on his answer to a lone interview question. RFA Br. at 21. As discussed below, however, when viewed in the light most favorable to plaintiff, the evidence in this case supports a finding that this explanation amounts to nothing more than pretext.

In particular, RFA argues that its decision to hire Ms. Kyi Kyi Than – over more qualified males including Dr. Than – was based upon a perceived "political bias" among two of

---

[11]    Because Mr. Cho was not hired before Ms. Kyi Kyi Than, whether he "did not have any prior broadcasting or specialized journalism experience," RFA Br. at 17, is irrelevant.

In addition, RFA assigns a "discriminatory regard" to Dr. Than's opinion of Mr. Cho, because Dr. Than allegedly considers Mr. Cho "a foreigner." RFA Br. at 17 n.17. Not only is RFA's assertion wholly irrelevant, it is inaccurate. Rather than exhibiting a discriminatory regard, Dr. Than's note that Mr. Cho was a "foreigner" was simply intended to express the fact that immigration issues might create difficulty for RFA were it to hire him.

the males candidates. *See* RFA Br. at 21. RFA bases this entire argument upon one question it asks during some – but not all – interviews concerning an the interviewee's position on Burmese democratic leader, Aung San Suu Kyi. While RFA purports to put great emphasis on its Aung San Suu Kyi question, it can offer no written documents supporting its claim that this question is asked of all interviewees. Nor can RFA offer any written documents that support a claim that anyone asking this question would be automatically disqualified from consideration. To the contrary, when Dr. Than asked Ms. Shwe how he had performed at his interview, he was not told that he answered this or any other question incorrectly, but rather was reassured that he had done "fine" and had "no" weaknesses. Than Aff. ¶ 22. This change of position alone is sufficient to refute RFA's claim that it is "undisputed" any answer to an interview question pertaining to Aung San Suu Kyi rendered him "unqualified." *See* RFA Br. at 21.

Nor can RFA offer any other indication that RFA places an emphasis upon concerns regarding possible "political bias" elsewhere during the interview process. To the contrary, during the time from which an interested candidate first submits his application and through the pre-employment testing and interview processes, the question concerning Aung San Suu Kyi is the *only* question concerning any possible political bias during the application and interview process. Shwe Depo. at 73. As Ms. Shwe testified:

> Q: My question is: At any point prior to the interview, during the application process are applicants asked their position on Aung San Suu Kyi?
>
> A: No.
>
> Q: The first [time] is at the interview?
>
> A: Only at the interview.
>
> Q: In Exhibit 2 which is the job announc[ement] listing the qualifications, --

A: Yes.

Q: -- is there any reference to either political bias or Aung San Suu Kyi?

A: No.

Shwe Depo. at 72-73; *see also*, *e.g.*, RFA Job Announcement (advertising position without reference to political bias); Radio Free Asia - Position Description, RFA-00434 (summarizing position and listing duties and responsibilities without reference to political bias) (Ex. 19)

Although it would seem reasonable to screen out applicants, who ultimately would be "blackballed" based on one interview question, prior to the actual interview, there is no mention of concerns about political biases in RFA's published job qualifications. *See* RFA Job Announcement. Likewise, it would seem obvious that if "[p]olitical biases, if broadcast in RFA, are problematic because they run counter to accepted journalistic standards and RFA's mission to broadcast balanced fair and editorial content and news" and that if "political biases are 'devastating,'" RFA Br. at 12 (citation omitted), that one would expect RFA to do more than ask one blinded question during the interview process to identify and exclude those individuals with such a bias.

RFA's reliance upon its Aung San Suu Kyi question as the reason it passed over qualified male candidates when hiring an unqualified female candidate is further belied by the fact that not all employees of RFA have even been asked this question. Indeed, prior to 2003, there is no evidence that this question was asked at interviews. Rather, Soe Thinn testified that during Dr. Than's first interview to be a full-time broadcaster this question was not even asked:

Q:     Mr. Thinn, you testified earlier that [Dr. Than] interviewed to be a full-time broadcaster in 2001?

A:     Yes.

Q:     And you sat in on that interview?

23

> A:    Yes.
>
> Q:    Do you recall whether or not [Dr. Than] was asked the [Aung San Suu Kyi] question during that interview?
>
> . . .
>
> A:    *He was not asked the question.*

Thinn Depo. at 157-58.

In addition, Deputy Director Shwe testified that other than the individuals in 2003 -- Dr. Than and Dr. Nyo -- no other candidate had ever been precluded from employment based on their answer to the alleged Aung San Suu Kyi question:

> Q:    Other than the individuals interviewing to be full-time broadcaster in 2003, to your knowledge are there other individuals who have answered the question regarding Aung San Suu Kyi that they [would] not report negative information?
>
> A:    No.

Shwe Depo. at 74-75.

Moreover, a senior editor at RFA who was personally interviewed by Soe Thinn in 1998 testified that he had never been asked about his views concerning Aung San Suu Kyi:

> Q:    [C]an you recall Soe Thinn specifically asking your opinion about Aung San Suu Kyi?
>
> A:    No, he didn't.

Nyane Depo. at 8.

In sum, RFA's after-the-fact reliance upon a lone, undocumented interview question to preclude the hiring of two otherwise qualified candidates -- without any other evidence of such a policy -- is unconvincing.  RFA's "political bias" pretext does not save RFA from liability for gender discrimination and certainly should not provide a basis for summary judgment.  To be sure, RFA's policy for hiring journalists who are not politically biased is "certainly not facially

illegitimate." *Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999). But as the *Zubieta* court

explained, "[t]hat, however, is not the question. The question is whether the plaintiffs have cast

such doubt on its credibility that a reasonable juror could regard it as pretext and infer a

discriminatory motive . . . ." *Id.* Here, based upon the above evidence, a reasonable jury could

find the undocumented testimony of Mr. Thinn and Ms. Shwe regarding their alleged concerns

about "political bias" not to be credible and conclude instead that this reason for not hiring

Dr. Than amounts to mere pretext. *See, e.g.*, *Weidel*, 234 F. Supp. 2d at 7.

### C.    RFA's Earlier Reason That Dr. Than Was Not Hired Due To Test Scores Was Also Pretext

That a jury could conclude RFA's explanations for hiring Ms. Kyi Kyi Than are pretext

also is supported by RFA's change in position with respect to an earlier reason it offered for

hiring Ms. Kyi Kyi Than over Dr. Than -- Dr. Than's pre-employment test scores. In particular,

earlier in this case, RFA asserted that it was not only RFA's concerns about possible political

bias, but also the applicants' test scores that prompted RFA to hire Ms. Kyi Kyi Than over Dr.

Than. *See, e.g.*, Defendant Radio Free Asia's Objections and Responses to Plaintiff Khin Maung

Than's First Set of Interrogatories, at No. 12 ("RFA Interrog. Resps.") ("Defendant did not hire

Plaintiff as a full-time broadcaster . . . because of his performance on RFA's Burmese Language

and Journalism test relative to other applicants."). RFA apparently has abandoned this argument

and does not offer test scores as a reason that Dr. Than was not hired in seeking summary

judgment. Rather, according to RFA, "[t]he language proficiency test was used as a screening

device to help determine which applicants would be interviewed." RFA Br. at 10. This change

in position is additional circumstantial evidence that RFA's proffered reasons for not hiring Dr.

Than are pretexts for discrimination. *See, e.g.*, *Weidel*, 234 F. Supp. 2d at 7 (in the context of

employment discrimination claims, "claims of discrimination and retaliation must most often be established circumstantially").

## III.   A Reasonable Jury Could Conclude RFA's Decision To Terminate Dr. Than Was The Direct Result Of Plaintiff's Complaint To The EEOC

Dr. Than's retaliation claim centers upon RFA's motives when deciding to terminate Dr. Than's voice consultant contract. To make out a prima facie claim, Dr. Than must show that a reasonable jury could conclude that he engaged in protected activity, was subsequently subjected to an adverse action by RFA, and that there was a causal connection between the two events. *Gipson*, 2006 WL 3040647, at *2. Thereafter, as with Dr. Than's gender discrimination claim, if RFA offers a nondiscriminatory reason for its decision, Dr. Than may rebut this decision by demonstrating this reason was pretext. *See, e.g., Cones*, 199 F.3d at 520.

Again, as discussed more fully below, plaintiff easily can satisfy his burden in opposing summary judgment. The record, when viewed in the light most favorable to Dr. Than, demonstrates two things. First, a reasonable jury could find that RFA had knowledge of plaintiff's EEOC complaint -- which RFA acknowledges to be a protected activity[12] -- in August or September 2004. Second, a reasonable jury could infer RFA did not make a decision to terminate plaintiff until after it had such notice -- in September or October 2004. Accordingly, RFA's claim that "no inference of the charge prior to the making of the decision at issue can be made," RFA Br. at 31, is palpably incorrect. Moreover, a reasonable jury could conclude that the reasons RFA offers after the fact and in the course of litigation for this action amount to nothing more than mere pretext that cannot withstand scrutiny.

---

[12]   *See* RFA Br. at 25.

26

**A.    RFA Decided To Terminate Dr. Than's Voice Consultant
Contract As A Result Of Dr. Than Filing A Complaint With The EEOC**

As a general rule, without direct evidence, plaintiff can demonstrate a causal connection

between protected activity and an adverse employment action by "showing that the employer had

knowledge of the employee's protected activity, and that the adverse personnel action took place

shortly after that activity." *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). Here,

almost immediately after the EEOC sent a Notice of Charge of Discrimination to RFA, the

company terminated Dr. Than as a voice consultant. As discussed more fully below, plaintiff has

shown that there exists "under the circumstances, a close enough temporal proximity to her

protected activity that a jury might properly infer that plaintiff was [terminated] in part because

[he] had pursued a sex discrimination claim." *Kalinoski*, 435 F. Supp. 2d at 73; *see also, e.g.,*

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that

proof of causal connection can be established indirectly by showing that protected activity is

followed by discriminatory treatment.").

In particular, after RFA had hired an unqualified female over several more qualified

males, plaintiff filed a charge with the EEOC, activity that RFA concedes is protected under

Title VII of the Civil Rights Act. RFA Br. at 25 (acknowledging this charge was protected

activity); Aug. 19, 2004 Notice. EEOC thereafter sent notice of this claim to RFA. *Id.* After

receiving notice of plaintiff's charge of gender discrimination, RFA submitted an official

response to the EEOC, dated October 1, 2004. Although RFA asserts that "the decision makers

in the Burmese Service . . . were not aware that Plaintiff had filed an EEOC charge at the time

the decision was made" RFA Br. at 29, to terminate plaintiff as a voice consultant at the time,

this claim cannot be reconciled with the formal response to this charge submitted by RFA.

Indeed, it makes little sense that Director Thinn – the same RFA employee deciding to hire Ms.

27

Kyi Kyi Than in 2003 and terminating plaintiff in 2004 – would not participate in responding to this EEOC notice. *See, e.g.*, Thinn Depo. at 151, 166 (testifying that he received notice of plaintiff's complaint in the fall of 2004 and has discussed it with counsel). Indeed, RFA's response to the EEOC could not have been prepared in the absence of participation by at least one of the only people responsible for making these adverse employment decisions.[13] Moreover, the record is undisputed that Dr. Than was not informed of his termination until October 2. Dr. Than Aff. ¶¶ 26-27.

RFA attempts to undermine a finding of retaliation by claiming contract decisions are made in August. *See, e.g.*, RFA Br. at 6. This assertion – which plainly involves a genuine issue of material of fact – is contradicted elsewhere in the record. Director Thinn testified unequivocally, that such decisions do not even begin before September:

> [E]very year *in September* I get a list from the contracts division of people who are under contract with the Burmese service, voicing consultants as well [as] editorial consultants.
>
> And we look at the – "we" meaning Nancy Daw Nyein Shwe, my deputy, and the senior editors at that time – look at it. And we discuss, okay, this needs – this person can be renewed, this person terminated.

Thinn Depo. at 68 (emphasis added); *see also id.* at 94.

Moreover, Deputy Director Shwe, who also admittedly was involved in the decision not to renew Dr. Than's contract, testified first that such decisions are not made until November:

> Q:    I just want to clarify: To the best of your knowledge at what point in time, like what month, were the decisions made in

---

[13]    For this reason, RFA's claim that notice of the EEOC charge "could not have reached the decision makers at the time of their decision was made" is unpersuasive. RFA Br. at 30 n.23. Indeed, as noted elsewhere, RFA has not even been consistent when identifying who these "decision makers" even were. *See supra* 31-32.

2003 and in 2004 with regard to the renewal of voice contractors' contracts?

A:    *November.*

Shwe Depo. at 98-99 (emphasis added).[14]

Finally, in addition to timing, the identity of those parties responsible for making decisions on contracts is not clear. According to Director Thinn, they are made by "senior management." *See, e.g.,* Thinn Depo. at 92-94; Than Aff. ¶ 27. But both Susan Lavery and Deputy Director Shwe testified otherwise. *See, e.g.,* Shwe Depo. at 49; Deposition of Susan Lavery at 14 ("Lavery Depo.") (Ex. 17). This dispute further counsels against summary judgment.

**B.    RFA's Reasons For Terminating**
**      Dr. Than's Voice Consultant Contract Are Pretext**

In response to the reasonable inference that RFA had knowledge of Dr. Than's EEOC charge before terminating plaintiff as a voice consultant, and terminated Dr. Than as a result of this complaint, RFA offers two reasons, neither of which survives scrutiny. First, RFA argues that it decided to terminate plaintiff as a voice consultant because it wanted "new voices." *See* RFA Br. at 25. Second, RFA claims it terminated Dr. Than because Dr. Than failed to demonstrate "the potential to become [a] full-time broadcaster[]." *Id.* As noted above, "plaintiff may rebut [these reasons] by showing that defendant's stated reason was in fact pretext."

---

[14]    While RFA likely will note that Deputy Director Shwe later contradicts herself by saying such decisions are made in August, this is the particular kind of conflicting testimony regarding a material issue of fact that renders summary judgment inappropriate here.

In addition, a decision date later than August is consistent with the delay accompanying the time between which voice or editorial consultant contracts might expire and the time a new contract is received. For example, as of December 2006, despite continuing to work as an editorial consultant, Dr. Than had yet to receive a new contract or any formal notice that such a contract would be renewed. Thinn Depo. at 150.

*Kinsey*, 557 F.2d at 836 (D.C. Cir. 1977). Indeed, an employee in a discrimination case survives summary judgment where "a jury could conclude by a preponderance of the evidence that the asserted reason is a pretext." *Barry v. United States Capitol*, 2005 WL 1026703, at *4 (D.D.C. May 2, 2005). And, notably, at the summary judgment stage, RFA's reliance upon subjective criteria must be viewed with scrutiny. *See, e.g.*, *Kalinoski*, 435 F. Supp. 2d at 71 ("explanations that rely heavily on subjective considerations merit closer scrutiny") (citation and internal quotations omitted); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) ("that question -- i.e., the employer's motive, is one rarely susceptible to resolution at the summary judgment stage"). As discussed below, the evidence is sufficient for a reasonable jury to conclude both of RFA's reasons are pretexts.

### 1.    RFA's "New Voices" Argument Is A Pretext

RFA argues that its decision to terminate Dr. Than was completely unrelated to Dr. Than's complaint with the EEOC and rather was motivated by RFA's desire for "new voices." RFA Br. at 25-26. That this pursuit of "new voices" is a pretext conceived of after the fact is obvious in light of three glaring absences: the lack of any employees prior to 2004 terminated for this reason, the absence of anything documenting this as a reason for terminating an employee, and the lack of a similar policy for other broadcasting positions. Further, RFA's conflicting testimony regarding who made the decision to terminate Dr. Than supports a finding that this explanation is pretextual.

When weighed against the record, RFA's claim that it is "stated practice" to seek new employees every two to three years appears to have been a practice on only one occasion -- 2004. Indeed, Deputy Director Shwe could identify no individuals whose contracts were not renewed because of RFA's desire to hire new voices in either 2002, 2003, or 2005. Shwe Depo. at 54-55.

Moreover, although claiming that it is "stated practice" to seek new voices, other than after the fact testimony by its own employees, RFA can offer nothing demonstrating such a preference for "new voices." Apparently, no such documented evidence exists:

> Q: Do you know whether or not there are any documents at the Burmese Service that would show new voices are one consideration when deciding whether or not to renew a voice consultant contract?

> A: We don't have documents like that.

Nyane Depo. at 27. Indeed, neither in RFA's employee handbook nor in any other written material is there mention of an RFA policy to seek "new voices." *See, e.g.*, *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131 (7th Cir. 1997) (upholding district court's finding of pretext and noting the " absence of any mention of this alleged longstanding policy in defendant's personnel practices manual, which contains over 300 pages of detailed information").

In addition, RFA's undocumented "policy" governing voice consultant contracts is inconsistent with its treatment of editorial consultants and full-time contractors. Indeed, although individuals in these positions also regularly broadcast to the public, RFA has no "policy" calling for their replacement in the name of "fresh voices" at any particular interval. *See, e.g.*, RFA Interrog. Resps. at 4 (demonstrating that some Burmese Service broadcasters had been employed for eight or more years); Than Aff. ¶ 15 (employed as editorial consultant over four years).

Not only is RFA's "new voices" policy undocumented and inconsistent with policies governing other broadcaster positions, but even determining who specifically made the decision to terminate Dr. Than's contract is a mystery. Indeed, Director Thinn argued that RFA reached the conclusion to seek new voices through consultations with its "senior editors." Thinn Depo.

at 101.  Senior Editor Nyane, however, testified that he had not been consulted about decisions to renew contracts:

> Q:  So to your recollection no one ever asked you whether or not they should terminate [Dr. Than]?
>
> A:  No.

Nyane Depo. at 21.

Similarly, Director Thinn testified that the decision to terminate Dr. Than was made by "senior management."  Than Aff. ¶ 27; Thinn Depo. 92-94.  But this explanation directly conflicts with Nancy Shwe, who testified unequivocally that only she and Director Thinn made the decision.  Shwe Depo. 49 (testifying that "Susan Lavery played no role in the decision not to renew [Dr. Than's] contract as a voice consultant"); *see also*, *e.g.*, Lavery Depo. at 14.  This directly conflicting testimony is further circumstantial evidence of pretext that defeats summary judgment.

### 2.    RFA's Explanation That Dr. Than Lacked The Potential To Become A Full-Time Broadcaster Is A Pretext

In addition to claiming that it wanted "new voices," RFA also claims that it decided to terminate Dr. Than's contract independent of his EEOC charge because Dr. Than did not demonstrate the potential to become a full-time broadcaster.  Director Thinn  explained this undocumented and wholly subjective policy:

> Q:    Could you describe how you determine whether or not a voicing consultant has a potential to become a full-time employee?
>
> A:    First of all, we *look at whether they've applied in the past. And if they have not gotten it, obviously that's already, you know, an indication* that they don't have the potential to become a . . . full-time consultant.

Thinn Depo. at 36 (emphasis added).

As noted, Dr. Than had expressed interest in becoming and applied to be a full-time broadcaster on several occasions -- including in 1998, 1999, 2000, 2001, 2002, and 2003 -- and was not successful on any occasion. *See, e.g.*, RFA Br. at 6 ("Beginning in 1998, Plaintiff submitted several applications for employment as a full-time broadcaster at RFA. These applications were largely unsuccessful."); RFA Statement of Facts ¶ 1 ("On several occasions between 1998 and 2003, Plaintiff submitted his resume to RFA to be considered for a position as a full-time broadcaster in the Burmese Service."). He also interviewed for the position early in 2002, but was not hired. Than Aff. ¶ 13. At a minimum, RFA concluded in 2001 that Dr. Than lacked the ability to become a full-time broadcaster:

> Q: When did the Burmese [service] first determine that [Dr. Than] did not have the potential to become a full-time broadcaster?
>
> A: When we decided – well, there was two occasions. *One was 2001*, again in 2003.

Thinn Depo. at 98 (emphasis added).

Despite its claimed policy and this earlier conclusion that Dr. Than "did not have the potential to become a full-time broadcaster," RFA nonetheless hired Dr. Than as a voice consultant in May 2002. *See, e.g.*, Thinn Depo. at 56-57; Dr. Than Aff. ¶ 14. And despite any concerns regarding Dr. Than's potential to be a full-time broadcaster, it renewed his contract in October 2002 and again in October 2003. RFA Br. at 9. Against this record, any argument that RFA did not renew Dr. Than's contract in 2004 due to concerns regarding his potential to become a full-time broadcaster cannot pass muster. At a minimum, whether such an excuse is a pretext rather than a legitimate concern is appropriate for resolution by a jury and defeats

summary judgment. *See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).[15]

Finally, RFA's claim that Dr. Than lacked the potential to become a full-time broadcaster is contrary to the testimony of Senior Editor Nyane, who stated that he and other individuals at RFA encouraged Dr. Than to seek such a position:

> Q    So, to the best of your recollection, [Dr. Than] told you he was applying to be a full-time broadcaster?
>
> A    Yes.  And we encouraged him.
>
> . . .
>
> Q    And you encouraged him to apply to be a full-time broadcaster?
>
> A    Yes.  Of course.

Nyane Depo. at 41-42.

## IV.    RFA's Arguments Concerning Damages Involve Disputed Issues Of Material Fact And Are Inappropriate For Summary Judgment

Attempting to deflect attention away from Dr. Than's gender discrimination and retaliation claims and the pretextual nature of its reasons for these hiring decisions, RFA devotes the last section of its brief to an issue inappropriate for summary judgment.  In particular, RFA argues that "[i]n the event the Court finds that [Dr. Than] is eligible to receive any damages, the amount of such damages should be reduced due to Plaintiff's complete failure to mitigate

---

[15]    In addition, whether Dr. Than's hours were reduced in September 2004 -- after RFA had received notice of his charge of gender discrimination -- is a fact question that should survive summary judgment.  Dr. Than testified that his hours were significantly reduced during this month.  Dr. Than Aff. ¶ 25.  Rather than introduce evidence that this was not true, RFA asserts that if his hours were in fact reduced, it was due to RFA not being able to reach Dr. Than by phone.  RFA Br. at 27.  But RFA acknowledges that such a problem existed throughout Dr. Than's employment at RFA, without explaining why this situation would become more problematic during this particular month.

damages by seeking alternative employment." RFA Br. at 35. Whether this argument might have merit, and it does not -- it is wholly out of place in a motion for summary judgment. Indeed, RFA does not cite any case holding that damages issues such as these could be resolved on summary judgment. Rather, RFA relies upon a case demonstrating just the opposite -- that mitigation of damages creates issues of fact unsuitable for summary judgment. *See District of Columbia v. Jones*, 442 A.2d 512, 524-25 (D.C. Ct. App. 1982) (cited by RFA at RFA Br. at 35). Ultimately, RFA cannot assert that this issue does not involve disputed issues of material fact; rather, the amount of damages to which Dr. Than would be entitled to is a quintessential factual issue that cannot be resolved at this stage of the proceedings.

Included within those damages sought by Dr. Than are "back pay and reasonable front pay" for both the position of full-time broadcaster, from September 2003 to present, and as a voice consultant, from October 2004 to present. Corrected Am. Compl. at Prayer for Relief 2. The factual issues related to these damages simply cannot be resolved on a motion for summary judgment. *See, e.g., Hopper v. Fin. Mgmt. Sys. Inc.*, Civ. A. No. 96-456, 1997 WL 31101 (D.D.C. Jan. 23, 1997) (finding question of damages issues involved fact questions precluding summary judgment).

Indeed, in making its mitigation of damages argument, RFA must demonstrate that substantially equivalent positions were available and that Dr. Than failed to exercise reasonable diligence when pursuing such positions, *Barbour v. Medlatntic Mgmt. Corp.*, 952 F. Supp. 857, 864 (D.D.C. 1997), both of which raise factual issues inappropriate for summary resolution. *First*, whether "substantially equivalent positions" were available at any point between September 2003 and the present involves factual issues. In *Barbour* -- the case relied upon principally by RFA -- the court explained that when pleading the affirmative defense of failure to

mitigate, defendant "must demonstrate that substantially equivalent positions were available and that the plaintiff failed to use reasonable diligence to obtain such positions." *Id.* at 863-64. Plaintiffs do not even attempt to demonstrate that "substantially equivalent positions" were available throughout the time period for which Dr. Than seeks backpay for his gender discrimination claim. Indeed, at no point does RFA even allege that a full-time broadcaster or substantially equivalent position was available. RFA Br. at 36-39. Rather, RFA lists certain positions Dr. Than has held in the past, none of which even pertain to broadcasting. *Id.* at 36. For this reason alone, RFA's damages argument is unpersuasive.

Moreover, with respect to Dr. Than's work as a voice consultant, RFA notes that Dr. Than briefly had the position of purchase order vendor ("POV") at Voice of America ("VOA"). RFA Br. at 38. As the very testimony that RFA cites demonstrates, Dr. Than did not work in this position for VOA until "2004 or 2005." Dr. Than Depo. at 51. This issue thus is irrelevant for the time between the alleged discrimination and the time at which he began as a POV. In addition, whether a jury might find this position to be "substantially equivalent" to either a full-time broadcaster or voice consultant position at RFA is a material issue of fact.

*Second*, RFA cannot demonstrate that Dr. Than failed to exercise reasonable diligence when seeking new employment after September 2003. To the contrary, RFA concedes that from September 2003 through late 2004, Dr. Than actively sought full-time employment with VOA, "*updating his resume every six months and indicating a continuing interest in the job*." RFA Br. at 37 (emphasis added); *see also*, *e.g.*, Dr. Than Depo. at 26-27. This plainly satisfies Dr. Than's burden of demonstrating that he had used reasonable diligence when pursuing substitute employment, and thus defeats any claim that Dr. Than would not be entitled to damages.

36

Ultimately, even those time periods and positions that RFA attempts to address only raise additional issues of fact that are not appropriate for summary judgment, including whether Dr. Than exercised reasonable diligence when seeking replacement employment, whether substantially equivalent employment existed, the amount of income Dr. Than would have earned in such positions, and whether Dr. Than would still be employed at such positions. The issue of damages is simply out of place in RFA's motion for summary judgment.

**V.    RFA Is Not Entitled To Summary Judgment With Respect To Dr. Than's Intentional Infliction Of Emotional Distress Claim**

Finally, the Court should deny RFA's motion for summary judgment on Dr. Than's claim for intentional infliction of emotional distress. This claim, like those discussed above, involves genuine issues of material fact that preclude relief under Rule 56. RFA correctly identifies the elements of a prima facie claim for intentional infliction of emotional distress: "(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress." RFA Br. at 31. Here, a reasonable jury could conclude that Dr. Than satisfies each element, and as a result, summary judgment is not appropriate.

*First*, a jury could find that RFA's discriminatory hiring practices are "extreme and outrageous." These practices include blatantly ignoring published qualifications and instead hiring candidates solely on the basis of gender. *See supra* at 14-19. Moreover, a jury could conclude that RFA's retaliation against Dr. Than constitutes extreme and outrageous conduct. *See supra* at 27-29. Indeed, "the facts surrounding plaintiff's termination are in dispute and those facts are crucial in determining whether defendants' conduct constitutes intentional infliction of emotional distress." *Varjao-Atkinson v. Catholic Univ. of Am.*, No. 93-CA00334, 1994 WL 394982 (D.C. Super. Ct. May 26, 1994); *see also, e.g., Brooks v. District of Columbia*, No. 05-362, 2006 WL 3361521 (D.D.C. Nov. 20, 2006). *Second*, the record in this case

37

demonstrates that Dr. Than has suffered from severe emotional distress as a result of his termination from RFA. Since October 2004, Dr. Than has suffered humiliation, depression, problems sleeping, nightmares, anxiety, and a lack of self-esteem and has lost confidence in his ability to work effectively. *See, e.g.*, Than Aff. ¶ 29; *see also* Deposition of Yamin Nyeine at 43-49 (Ex. 18).

While summary judgment on intentional infliction of emotional distress claims might be appropriate under some circumstances, in this case it is not.

## CONCLUSION

In sum, all of Dr. Than's claims raise genuine issues of material fact that preclude summary judgment. For the foregoing reasons, plaintiff Dr. Khin Maung Than respectfully requests that the Court deny defendant RFA's motion for summary judgment.

Respectfully submitted,

Steven G. Reade (DC Bar #370778)
David E. Kouba (DC Bar #483145)
Joshua M. Glasser (DC Bar #489416)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Tel: (202) 942-5000
Fax: (202) 942-5999

Dated: January 22, 2007